UNIROYAL, INC., Plaintiff,

v.

The HOME INSURANCE CO., et al., Defendants.

No. CV–84–3999 (JBW).

United States District Court,
E.D. New York.

Dec. 19, 1988.

Joseph Ferraro, Myron Kalish, Bruce A. Hecker, Shea & Gould, New York City, for plaintiff Uniroyal, Inc.

Sheila L. Birnbaum, Irene A. Sullivan, Timothy G. Reynolds, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant The Home Ins. Co.

Michael Nussbaum, Nussbaum, Owen & Webster, Washington, D.C., for London Insurer defendants.

William E. Hegarty, Michael Tierney, Leonard A. Spivak, Gary A. Paranzino, Cahill, Gordon & Reindel, New York City, on the brief of amicus curiae Diamond Shamrock Chemicals Co.

## REVISED MEMORANDUM AND ORDER

WEINSTEIN, District Judge:

### I. PROCEDURAL HISTORY

This lawsuit is part of the "Agent Orange" Product Liability Litigation. In the underlying mass toxic tort action, a class of approximately 2.5 million Vietnam veterans and their family members sued the United States and the manufacturers of phenoxy herbicides used in the Vietnam war. The plaintiffs alleged that exposure to the herbicides and the contaminant dioxin resulted in a variety of devastating maladies, including cancers, genetic damage and birth defects, skin diseases, and nervous disorders.

The class action was effectively concluded on May 7, 1984 by a settlement in which seven manufacturers agreed to pay the class $180 million. *See, e.g., In re "Agent Orange" Product Liability Litigation,* 597 F.Supp. 740 (E.D.N.Y.1984) (finding settlement reasonable and fair); *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1396 (E.D.N.Y.1985) (ordering distribution plan). Actions by those who opted out of the plaintiffs' class were dismissed on motions for summary judgment. *See In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1223 (E.D.N.Y. 1985), 611 F.Supp. 1267 (E.D.N.Y.1985) (dismissing claims of opt-outs on grounds of inability to prove causation and military contractor defense).

Over three years of appeals followed, culminating in affirmances by the Court of Appeals for the Second Circuit and the denials of petitions for *certiorari* by the United States Supreme Court. *See In re "Agent Orange" Product Liability Litigation,* 689 F.Supp. 1250 (E.D.N.Y.1988) (summarizing history of litigation, settlement, and appeals, and ordering final distribution plan).

Having settled with the class of veterans, Uniroyal Inc. ("Uniroyal") seeks reimbursement from its insurance carriers for its share of the settlement, approximately $9 million, and for its defense costs, approximately $3 million. Uniroyal also seeks a declaration that it is covered for

additional "Agent Orange" litigation defense costs and liabilities. Subject matter jurisdiction is based on diversity. 28 U.S.C. § 1332.

The parties have filed cross-motions for summary judgment. They disagree about the interpretation of an "occurrence" and of the "war risk exclusion" in the insurance policies issued to Uniroyal by The Home Insurance Company ("Home"). Home argues that (1) Uniroyal has failed to meet its burden of proving "actual injuries" underlying the settlement; (2) each spraying in Vietnam constitutes one separate "occurrence," to which a separate deductible must be applied; and (3) coverage is unavailable because of the war risk exclusion. Uniroyal contests each of Home's contentions, and urges that there was but one occurrence, namely the negligent manufacture and failure to warn of dioxin dangers.

## II. FACTS

### A. Herbicide Production.

"Agent Orange"—a term used in this litigation to comprise the group of related phenoxy herbicides labelled Agents Orange, White, Blue, Pink, Purple and other designations—was sprayed by the United States military in Vietnam between 1961 and 1971, principally in order to defoliate areas in which enemy guerilla forces might conceal themselves and to destroy crops. Over the entire period, between 17 and 19 million gallons of the herbicides were sprayed, covering about ten percent of the total land area of South Vietnam. The peak year of spraying was 1967, in which eighteen to twenty-seven aerial spray sorties were flown each day. See In re "Agent Orange" Product Liability Litigation, 597 F.Supp. 740, 776–77 (E.D.N.Y. 1984). There may have been well over twenty thousand aerial spray sorties, as well as many smaller hand-held spray applications.

Plaintiff Uniroyal entered into three contracts, dated September 1, 1966, January 31, 1967, and May 2, 1967, to produce Agent Orange for the United States military. Uniroyal directed its operations from its offices in Naugatuck, Connecticut and

manufactured the herbicides at its plants in Canada following detailed specifications published by the military. As it was obligated to do by its contracts, Uniroyal transported the herbicides to military depots on the West Coast of North America, under the direction of the Air Force Aerospace Fuels Field Office ("AFAFFO") in Bell, California.

Uniroyal's first delivery occurred on October 6, 1966, and its last on March 1, 1968. During that time Uniroyal made a total of 110 deliveries to the Air Force. The number of deliveries was a function of the size of the available freightcars; each of the 110 deliveries consisted of 100 or more 55–gallon drums. The three contracts overlapped somewhat and their delivery schedules dovetailed, so that the delivery schedules of the three contracts intermingled and ran smoothly into one another. Of the first thirty-eight deliveries, thirty-one were for exactly 5,451 gallons of herbicide. The last seventy-two deliveries were each for exactly 6,868.26 gallons. Except for January, February and April of 1967, when no deliveries were made, Uniroyal shipped steadily at least three deliveries per month and as many as thirteen in one month. See Stipulated Delivery Schedule. In overview, Uniroyal undertook a routinized, repetitive delivery process in which it regularly and continuously supplied the Air Force virtually identical shipments for seventeen months.

Once Uniroyal delivered the Agent Orange to the Air Force on the West Coast, Uniroyal had nothing further to do with the herbicides or their application. The military shipped its mixtures to Vietnam for mixing with other manufacturers' herbicides, and possibly with other chemicals, and for spraying. Delivery in the United States ended Uniroyal's part in the Agent Orange process. Uniroyal played no role in the formulation of the final herbicide mixtures, the transport to Asia, the choice of spray methods and technology, warnings to the users, safety procedures, the selection of spray sites, or the supervision of spray sorties. The safety of spray techniques was managed (if at all) entirely by

the government. The number of spray sorties and the amount of Agent Orange released on each sortie was determined solely by the military, often on a day-to-day or moment-to-moment basis.

In a civilian contractual relationship, Uniroyal would likely have provided support personnel at the point of application, training instructors and manuals, and periodic project reviews. Uniroyal would have been able to advise its buyers to take proper safety precautions precisely in order to avoid liability to victims from careless or excessive spraying. The armed forces, however, took complete control and permitted no input from the civilian suppliers. Uniroyal had neither contractual nor economic influence over its military customers' activities. In sum, Uniroyal was walled off from all influence over its product after it made delivery in the United States.

## B. Insurance Coverage.

During the period in question Uniroyal purchased five consecutive Comprehensive General Liability ("CGL") insurance policies from Home. The durations and limits of the Home policies are summarized in the table below.

| Dates in effect | Aggregate limit per occurrence | Aggregate limit per year | Deductible* per occurrence |
|---|---|---|---|
| 2/1/65–5/1/67 | $ 6,000,000 | $ 6,000,000 | $100,000 |
| 5/1/67–5/1/70 | $10,000,000 | $10,000,000 | $100,000 |
| 5/1/70–9/8/72 | $10,000,000 | $10,000,000 | $500,000 |
| 9/8/72–9/8/75 | $10,000,000 | $10,000,000 | $250,000** |
| 9/8/75–9/8/76 | $ 2,000,000 | $ 2,000,000 | $500,000 |

\* Deductibles are designated "Self–Insured Retainers" under the policy.
\*\* Up to a maximum annual deductible of $1,000,000, and a maximum cumulative deductible of $3,000,000 over the policy period.

In addition, beginning September 8, 1976, Uniroyal purchased coverage from the thirteen "London Insurers" also named as defendants in this lawsuit. As indicated below, the terms of these policies are not at issue on these cross-motions for summary judgment, because none of the London Insurers' policies was in effect at times triggered by Agent Orange-related injuries. The London Insurers appeared at the oral argument on these motions but have filed no pertinent papers.

The cross-motions concern disputed interpretations of the policies Uniroyal purchased from Home. The five Home policies indemnified Uniroyal:

for all sums which the Insured shall be obligated to pay by reason of the liability
  (a) imposed on the Insured by law, or
  (b) assumed under contract or agreement by the Named Insured ...

for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of—
  (i) Personal Injuries, including death at any time resulting therefrom,
  (ii) Property Damage,
  (iii) Advertising Liability,
caused by or arising out of each occurrence happening anywhere in the world.

The term "all sums" was modified by the limits and deductibles described in the table above. "Ultimate Net Loss" was defined to include "the total sum which the insured ... become[s] obligated to pay ... either through adjudication or compromise ... and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder ..."

The critical term "occurrence" was defined to be:

an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

Each of the policies was also subject to certain exclusions. One of these is at issue here: the so-called "war risk exclusion." It provides that:

[The policy shall not apply,] except in respect of occurrences taking place in the United States of America, its territories or possessions, or Canada, to any liability of the insured directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities, (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority.

## III. LAW

### A. Governing Law.

■ This is a diversity action concerning insurance policies issued in New York State. The parties have agreed by stipulation, and the court concurs, that New York law governs the substantive interpretation of those policies. Absent some public policy against such a stipulation, the parties' agreement should be followed. *See Twohy v. First Nat. Bank of Chicago,* 758 F.2d 1185 (7th Cir.1985); *Robbins v. Ogden Corp.,* 490 F.Supp. 801, 806 n. 2 (S.D.N.Y. 1980). Here there are enough contacts with New York to warrant honoring the stipulation. The defendant apparently issued the policies from its main office in New York and no other single jurisdiction had more meaningful contacts. New York substantive law governs.

### B. Ripeness for Final Decision.

Although this matter was originally brought on as cross-motions for summary judgment, it may be decided as a trial on stipulated facts. The magistrate reported on August 26, 1986 that discovery was completed and that the case was ready for trial. Both sides submitted affidavits and documents bearing on the facts at issue. Neither side demanded a jury. At oral argument held October 17, 1988, it became apparent that certain additional facts might need to be determined and on November 18, 1988, the parties entered into a comprehensive stipulation resolving any remaining factual issues. The parties agree that no issues of fact remain and that neither side wishes a trial on any issue. The court is in as good a position to find the facts now as it would be after further litigation.

There is no issue of credibility and all facts are either stipulated or based on documents. Under these circumstances either summary judgment or a decision on a stipulated record is appropriate. *See, e.g., United States v. Fred A. Arnold, Inc.,* 573 F.2d 605, 606 (9th Cir.1978) ("Under proper circumstances a hearing on a complete record under cross-motions for summary judgment may amount to a stipulation of the parties to a court trial on an agreed written record.").

Employment of Rule 56 to dispose of cases without trial when there is no dispositive issue of fact is encouraged. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Second Circuit agrees. *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9 (2d Cir.1986); *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir. 1987).

■ This current rule on summary judgment has special importance for insurance coverage disputes because of some prior confusion over the resolution of "ambigui-

ties" in an insurance policy. Two aspects of "ambiguity" appear to be in conflict: ambiguity in an insurance contract that may render summary judgment improper as a matter of federal civil procedure; and ambiguity in an insurance contract that must be construed by the court as a matter of substantive state contract law. The former, proceduralist view, stresses that ambiguity inherently necessitates a full presentation of extrinsic evidence for the factfinder's evaluation. The latter, substantive view, rests on the assumption that, as a matter of substantive state insurance contract law, ambiguities in an insurance policy are to be construed by the court against the insurer. A motion for summary judgment on an ambiguous insurance policy in a diversity case appears to invoke these inconsistent rules simultaneously. As demonstrated below, the proper resolution under federal procedure and New York law is that summary judgment is proper on an ambiguous insurance policy when, after having allowed full discovery and found no valuable extrinsic evidence of the parties' intent, the court applies as a last resort the state law presumption construing the policy against the insurer.

Insurance contracts in diversity actions must be interpreted under the applicable state law. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.2d 1188 (1938); *Abex Corp. v. Maryland Casualty Co.,* 790 F.2d 119, 124 (D.C.Cir.1986) (following *Erie* to apply state law to interpret insurance policy in diversity action); *Eli Lilly and Co. v. Home Insurance Co.,* 764 F.2d 876, 882 (D.C.Cir.1985) (same); *Board of Education, Yonkers City School District v. CNA Insurance Co.,* 647 F.Supp. 1495, 1501–02 (S.D.N.Y.1986) (applying New York law to interpret insurance policy); *American Home Products Corp. v. Liberty Mutual Insurance Co.,* 565 F.Supp. 1485, 1488 (S.D.N.Y.1983) ("New York law controls" interpretation of insurance contract in diversity action), *aff'd as modified,* 748 F.2d 760 (2d Cir.1984); *Schering Corp. v. The Home Insurance Co.,* 544 F.Supp. 613, 618 (E.D.N.Y.1982) ("we note first our obligation under *Erie* ... to apply the substantive law of New

York" to insurance interpretation), *rev'd on other grounds,* 712 F.2d 4 (2d Cir.1983).

Courts adopting the proceduralist view of ambiguity to bar summary judgment tend to ignore the recent reinvigoration of summary judgment as well as the primacy of state law in interpreting insurance contracts. For example, the Second Circuit declared as recently as this year: " 'Where contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment [is] improper.' " *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23 (2d Cir.1988), *quoting Aetna Casualty & Surety Co. v. Giesow,* 412 F.2d 468, 471 (2d Cir.1969). *Cf. Walk–In Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 264 (2d Cir.1987) (holding ambiguity renders summary judgment improper; relying on one 1975 federal case). The *Garza* court opened its discussion by calling summary judgment a "drastic procedural weapon." Id. at 26 (relying on several pre–1976 cases). This is precisely the notion that the Supreme Court rejected in 1986. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole ..."); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 12 (2d Cir.1986); *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.1987).

The proceduralist viewpoint expressed in *Garza* has been applied in cases quite similar to the present dispute. In the leading such case, *Schering Corp. v. The Home Insurance Corp.,* 712 F.2d 4 (2d Cir.1983), the court found that the "trigger of coverage" clause in the comprehensive general liability insurance contract at issue was susceptible of two reasonable interpretations and held that summary judgment was therefore "perforce improper," *id.* at 9, reversing the district court. *Schering,* like

*Garza,* held the older view that summary judgment is "drastic." Subsequent decisions have eviscerated the precedential force of the appellate opinion in *Schering. See American Home Products Corp. v. Liberty Mutual Insurance Co.,* 748 F.2d 760, 765 (2d Cir.1984) *("AHP").* The District of Columbia Circuit in *Abex Corp. v. Maryland Casualty Co.,* 790 F.2d 119 (D.C.Cir.1986), found that *AHP's* distinguishing of *Schering* made sense only as "a sub silencio" overruling or modification of *Schering Corp.*

> We simply do not understand [the *AHP*] distinction; in our view, the interpretations urged in *Schering Corp.* differ little from those in *AHP.* Because the latter case is the most recent and better reasoned decision, we view it as the best reading of New York law. We can only comprehend *AHP* as a *sub silencio* overruling or modification of *Schering Corp.*

Id., 790 F.2d at 127–28 n. 37. Since the change of tack in *AHP, Schering* has been limited to its one unassailable proposition, that summary judgment on an ambiguous insurance policy should not be granted while discovery is still incomplete. *See Burroughs Wellcome Co. v. Commercial Union Insurance Co.,* 632 F.Supp. 1213, 1220, 1224–25 (S.D.N.Y.1986); *Aetna Casualty & Surety Co. v. Abbott Laboratories, Inc.,* 636 F.Supp. 546, 550 n. 7 (D.Conn.1986).

When confronted with the clear edicts of New York substantive insurance law, the proceduralist view of ambiguity must yield. Blanket refusals to grant summary judgment on ambiguous insurance contracts, as in *Garza,* are inappropriate when New York substantive law governs.

The federal court must accommodate the proceduralist and substantive views by granting summary judgment after full discovery discloses no extrinsic evidence raising a question of credibility or suggesting a choice among reasonable inferences. At that point the federal court is constrained under New York law to construe the ambiguity against the insurer (as drafter) as a matter of substantive law. (We do not need to consider the question of what New York law would be were the clause in question negotiated, or even dictated, by a powerful insured, for this is not such a case.) Only where extrinsic evidence raises a question of credibility or suggests a choice among reasonable inferences must the matter be submitted to the factfinder.

Under New York law, an insurance policy is a contract "which, like any other contract, must be construed to effectuate the parties' intent as expressed by their words and purposes." *AHP,* 565 F.Supp. 1485, 1492 (S.D.N.Y.1983), *aff'd as modified,* 748 F.2d 760 (2d Cir.1984). *See also Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1283 (1978); *Hartford Accident & Indemnity Co. v. Wesolowski,* 33 N.Y.2d 169, 171–72, 350 N.Y.S.2d 895, 898, 305 N.E.2d 907, 909 (1973); *McGrail v. Equitable Life Assurance Society,* 292 N.Y. 419, 55 N.E.2d 483 (1944). If the policy is unambiguous, its interpretation is strictly a question of law for the court. *Caporino v. Travelers Insurance Co.,* 62 N.Y.2d 234, 239, 476 N.Y.S.2d 519, 521, 465 N.E.2d 26, 27 (1984) (per curiam); *Wesolowski,* 33 N.Y.2d at 172, 350 N.Y.S.2d at 898, 305 N.E.2d at 909 ("the courts have declared on countless occasions that it is the responsibility of the court to interpret written instruments.... This is obviously so where there is no ambiguity.") (citations omitted); *See Board of Education v. CNA Insurance Co.,* 647 F.Supp. 1495, 1502 (S.D.N.Y.1986).

Where the terms of the policy admit of ambiguity, the court should afford the parties an opportunity to adduce extrinsic evidence as to their intent. *See Ploen v. Aetna Casualty and Surety Co.,* 138 Misc.2d 704, 525 N.Y.S.2d 522, 524 (Sup.Ct. Nassau Co.1988). This invitation might result in three outcomes relevant under New York law: extrinsic evidence offered that raises a question of credibility or presents a choice among reasonable inferences; extrinsic evidence offered that fails to raise credibility or present such a choice; or no extrinsic evidence offered. New York law requires a submission to the factfinder in the first situation, but a construction by the court as a matter of law in the second and third situations. The New York Court

of Appeals addressed the first and third situations precisely in *Wesolowski:*

> If there is ambiguity in the terminology ... and determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such a determination is to be made by the jury. On the other hand, if the equivocality must be resolved wholly without reference to extrinsic evidence the issue is to be determined as a question of law for the court.

*Wesolowski,* 33 N.Y.2d at 172, 350 N.Y.S. 2d at 898, 305 N.E.2d at 909. *See also Mallad Construction Corp. v. County Federal Savings & Loan Ass'n,* 32 N.Y.2d 285, 291, 344 N.Y.S.2d 925, 930, 298 N.E.2d 96, 100 (1973).

If—as here—the parties do not, after opportunity to do so, offer extrinsic evidence, the court is bound to construe the ambiguity as a matter of law. "Even in the event that an ambiguity is discerned, so as to permit reference to extrinsic evidence, the interpretation of the ambiguous language may nevertheless be determined on a motion for summary judgment where the parties rely upon the written agreement and do not refer to parol evidence to shed light upon the intended meaning of their words." *Carvel Corp. v. Rait,* 117 A.D.2d 485, 503 N.Y.S.2d 406, 409 (2d Dept.1986) (citation omitted). *See also Vargas v. Insurance Co. of North America,* 651 F.2d 838, 840, 842 (2d Cir.1981); *Wesolowski,* 33 N.Y.2d at 172, 350 N.Y.S.2d at 898, 305 N.E.2d at 909 (where "no relevant evidence extrinsic to the insurance policy" is offered, "there is no question of credibility and there are no inferences to be drawn from extrinsic evidence ... this case presents no dispute of fact for a jury"); *Rom Terminals, Ltd. v. Scallop Corp.,* 141 A.D.2d 358, 529 N.Y.S.2d 304, 306 (1st Dept.1988); *Ploen v. Aetna Casualty and Surety Co.,* 138 Misc.2d 704, 525 N.Y.S.2d 522, 525 (Sup.Ct. Nassau Co.1988).

Although no court appears to have been confronted with the second possible outcome—extrinsic evidence offered that does not raise questions of credibility or reasonable alternative inferences—it too is a case

for construction by the court as a matter of law. *See Board of Education v. CNA Insurance Co.,* 647 F.Supp. 1495, 1502 (S.D.N.Y.1986) (ambiguous provisions are to be construed by the court *"unless* 'determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences ...,'" quoting *Wesolowski*) (emphasis added). *See also Carvel Corp. v. Rait,* 117 A.D.2d 485, 503 N.Y.S.2d 406, 409 (2d Dept.1986) (if "no questions of credibility are raised, and there are no inferences to be drawn from the extrinsic evidence ... the motion present[s] an issue of law"). Any evidence not going to credibility or failing to show an alternate reasonable inference does not raise "disputed issues of *material* fact" under New York law, and does not require a jury determination. *See id.,* 503 N.Y.S.2d at 409 (emphasis added); *Board of Education v. CNA Insurance Co.,* 647 F.Supp. at 1502.

The appraisal of the value or existence of extrinsic evidence is for the court as a matter of substantive law. The threshold question of whether the contract is ambiguous is one of law. *See Sutton v. East River Savings Bank,* 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075, 1077 (1982); *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987); *Tokio Marine and Fire Insurance Co. v. McDonnell Douglas Corp.,* 617 F.2d 936, 940 (2d Cir.1980). Thus the court must determine the nature of any ambiguity present after any extrinsic evidence has been adduced. The district court's opinion in *Schering,* now rehabilitated despite its reversal, points out that the appraisal of the extrinsic evidence is a matter of state law: "The determination whether contractual intent is a factual or legal question is governed by the substantive law of contracts. It is in no sense a 'procedural' question even though it is critical in ascertaining the propriety of summary judgment under F.R.Civ.P. 56." *Schering,* 544 F.Supp. at 621 n. 4, *rev'd,* 712 F.2d 4 (2d Cir.1983). *Cf. Abex Corp. v. Maryland Casualty Co.,* 790 F.2d 119, 126 n. 35

(D.C.Cir.1986) ("[U]nder New York law ... a court must not jump too readily to a conclusion that a contract has no plain meaning.").

The method of construing ambiguity under New York law is not in tension with federal procedure, properly understood. The state law requires evidence showing a real issue of interpretation for a jury. "[I]t is not enough for the opponent to show that an agreement is ambiguous.... The opponent must also disclose in evidentiary form the particular parol evidence, if any, on which it relies. Otherwise, there are only documents to interpret, and the court may resolve ambiguities...." *Mallad Construction Corp. v. County Federal Savings & Loan Ass'n*, 32 N.Y.2d 285, 290, 344 N.Y.S.2d 925, 930, 298 N.E.2d 96, 100 (1973) (citations omitted). Similarly, federal procedure requires a genuine issue of material fact to surmount summary judgment. The party opposing summary judgment may not survive by showing "the mere existence of factual issues—where those issues are not material to the claims before the court." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam). The facts must be "material," a criterion "reinvigorated" in recent years, "thus making it more difficult to avoid summary judgment by disputing insignificant underlying facts." *Board of Education v. CNA Insurance Co.*, 647 F.Supp. 1495, 1503 (S.D.N.Y.1986). There must be "specific facts raising a genuine issue," *King Service, Inc. v. Gulf Oil Corp.*, 834 F.2d 290, 295 (2d Cir.1987). *See generally Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9 (2d Cir.1986).

The rejuvenation of summary judgment promises increased use in cases like the present one. "Such an insurance contract interpretation question is one *ideally suited* for summary judgment; the type of case for which the Supreme Court has encouraged summary judgment disposition." *American Motorists Insurance Co. v. General Host Corp.*, 667 F.Supp. 1423, 1427 (D.Kan.1987) (emphasis added) (citing *Anderson* and *Celotex*).

On a motion for summary judgment, then, persistent ambiguity coupled with an absence of relevant extrinsic evidence requires the court to construe the ambiguity according to New York insurance doctrine. At this stage, "after it has exhausted every effort to derive the meaning of the terms that accurately reflects the intent of the parties," *AHP*, 565 F.Supp. at 1492, the court must follow the rule of *contra proferentem* to construe any ambiguity against the insurer as drafter. "Well-recognized is the general rule that ambiguities in an insurance policy are to be construed against the insurer." *Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 353, 413 N.Y.S.2d 352, 354, 385 N.E.2d 1280 (1978). Where the "policy was written by the insurer ... any ambiguity is to be resolved against it." *Greaves v. Public Service Mutual Insurance Co.*, 5 N.Y.2d 120, 125, 181 N.Y.S.2d 489, 492, 155 N.E.2d 390, 392 (1959). New York adheres "clearly and unequivocally," *National Screen Service Corp. v. United States Fidelity and Guaranty Co.*, 364 F.2d 275, 277 (2d Cir.1966), to the "hornbook rule that policies of insurance, drawn as they ordinarily are by the insurer, are to be liberally construed in favor of the insured." *Miller v. Continental Insurance Co.*, 40 N.Y.2d 675, 678, 389 N.Y.S.2d 565, 567, 358 N.E.2d 258, 260 (1976). "Under New York law ... an ambiguous provision in an insurance policy is construed 'most favorably to the insured and most strictly against the insurer.'" *Vargas v. Insurance Co. of North America*, 651 F.2d 838, 839–40 (2d Cir. 1981) (quoting *Index Fund, Inc. v. Insurance Co. of North America*, 580 F.2d 1158, 1162 (2d Cir.1978), *cert. denied*, 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979)). *See also American Motorists Insurance Co. v. Levelor Lorentzen*, (D.N.J.1988) [1988 WL 112142]; Developments in the Law, *Toxic Waste Litigation: Bankruptcy and Insurance Issues*, 99 Harv.L.Rev. 1458, 1578–79 (1986) (analyzing *contra proferentem*). *But see* Note, *Insurance as Contract: The Argument for Abandoning the Ambiguity Doctrine*, 88 Colum.L. Rev. 1849 (1988).

The rule demands that a "construction favorable to the insurer will only be sustained where it is the sole construction which can fairly be placed upon the words

employed." *Cantanucci v. Reliance Insurance Co.,* 43 A.D.2d 622, 349 N.Y.S.2d 187, 191 (3rd Dept.), *aff'd mem.,* 35 N.Y.2d 890, 364 N.Y.S.2d 890, 324 N.E.2d 360 (1974); *accord Seaboard Surety Co. v. The Gillette Co.,* 64 N.Y.2d 304, 311, 486 N.Y.S.2d 873, 876, 476 N.E.2d 272, 275 (1984). "The insurer bears a heavy burden of proof, for it must ' "establish that the words and expressions used not only are susceptible of the construction sought by [the insurer] but that it is the only construction which may be placed on them." ' " *Vargas v. Insurance Co. of North America,* 651 F.2d 838, 840 (2d Cir.1981) (citations omitted). *See also Sincoff v. Liberty Mutual Fire Insurance Co.,* 11 N.Y.2d 386, 390, 230 N.Y.S.2d 13, 16, 183 N.E.2d 899, 901 (1962) (insurer must show both that insured's construction is unreasonable and that insurer's is "the only one that fairly could be placed upon the policy."); *Bronx Savings Bank v. Weigandt,* 1 N.Y.2d 545, 552, 154 N.Y.S.2d 878, 883, 136 N.E.2d 848, 851 (1956) (same).

The rule of *contra proferentem* in New York "would seem to have special vigor when applied to a policy ... which is by its own terms denominated a 'comprehensive general liability policy.' " *National Screen Service Corp. v. United States Fidelity and Guaranty Co.,* 364 F.2d 275, 279–80 (2d Cir.1966).

In effect, New York law creates a presumption. Like other burden of proof rules, when the state law "supplies the rule of decision," "the effect of" a presumption or burden of proof "is determined in accordance with State law." Fed.R.Evid. 302. *See, e.g., Dick v. New York Life Ins. Co.,* 359 U.S. 437, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959) ("Under the *Erie* rule presumptions (and their effects) and burden of proof are 'substantive'.").

Numerous courts at all levels of government have reiterated these fundamental principles for construing insurance contracts under New York state law. *See,*

*e.g., Ace Wire & Cable Co., Inc. v. Aetna Casualty & Surety Co.,* 60 N.Y.2d 390, 398, 469 N.Y.S.2d 655, 658, 457 N.E.2d 761, 764 (1983); *Ploen v. Aetna Casualty and Surety Co.,* 138 Misc.2d 704, 525 N.Y.S. 522, 527 (Sup.Ct. Nassau Co.1988); *Vargas,* 651 F.2d at 839–40; *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.,* 505 F.2d 989, 999–1000 (2d Cir.1974); *Board of Education v. CNA Insurance Co.,* 647 F.Supp. 1495, 1502 (S.D.N.Y.1986); *AHP,* 565 F.Supp. at 1492–93; *Schering,* 544 F.Supp. at 620.

When construing an ambiguous provision, the court must remain as faithful as possible to the clear intent of the parties. "No construction of an ambiguous provision is permitted that is inconsistent with the contract's plain meaning or with the parties' clear intentions.... To disregard express language in an insurance contract because of a claimed ambiguity 'would violate the more fundamental rule of construction' that requires a court to construe the contract as a whole and, whenever possible, give effect to all of its parts.' " *AHP,* 565 F.Supp. at 1492 (citation omitted). Of course, where ambiguity is found, "plain meaning" and "clear intentions" will not usually be in abundant supply. The court must do its best to make sense of the ambiguity, construing it against the insurer, "in the context of the policy as a whole, the purposes sought to be accomplished, and the relevant surrounding circumstances." *Id.* at 1493.

Some New York cases suggest that the ambiguous provision is to be viewed as an "average man" would view it. *See, e.g., Bronx Savings Bank v. Weigandt,* 1 N.Y.2d 545, 552, 154 N.Y.S.2d 878, 883, 136 N.E.2d 848, 851 (1956); *Lachs v. Fidelity & Casualty Co. of New York,* 306 N.Y. 357, 364, 118 N.E.2d 555 (1954). Others question whether such a standard is appropriate for complex comprehensive general liability policies issued to large corporate manufacturers. *See, e.g., National Screen Service Corp. v. United States Fidelity and Guaranty Co.,* 364 F.2d 275, 278 (2d Cir.1966). The best and most recent explanation is

that the policy should be viewed as if by a reasonably intelligent business person who is familiar with the agreement and with the industry in question. *See Ace Wire & Cable Co., Inc. v. Aetna Casualty & Surety Co.*, 60 N.Y.2d 390, 398, 469 N.Y.S.2d 655, 658, 457 N.E.2d 761, 764 (1983); *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987). Normally the court can put itself in this position, so that expert evidence need not be submitted. *See* Fed.R.Evid. 702.

With these standards in mind, it is apparent that the present dispute is ripe for final disposition. Discovery has been completed, and all the evidence offered by the parties is before the court. No jury has been demanded, so there can be no fear that summary judgment would deprive anyone of the right to a jury trial. Both sides agreed at oral argument that no trial was desirable on any issue.

The parties have offered no relevant extrinsic evidence to assist in the interpretation of any provision thought to be ambiguous. Nor has there been a suggestion that such evidence exists. The construction of any ambiguity is solely for the court as a matter of law.

## C. Proof of Actual Injury.

■ The first ground on which Home seeks summary judgment is the contention that Uniroyal has failed in its obligation to establish that "actual injury" took place. Only a brief discussion is necessary to deal with the matter.

First, the plain text of the policies Home sold to Uniroyal belies Home's insistence on litigated proof of injury. A liability incurred by reasonably settling a case is unquestionably a covered loss so long as the claim settled would itself have been a covered loss. The policies cover "all sums which the insured shall be obligated to pay by reason of the liability (a) imposed upon the Insured by law or (b) assumed under contract or agreement by the Named Insured … for damages … on account of—

(i) Personal Injuries … arising out of each occurrence. . . ."

A settlement of an underlying personal injury tort suit is a "contract or agreement" invoking these terms, as long as the "occurrence" is covered by the policy. Included in the definition of "ultimate net loss" is "the total sum which the insured … become[s] obligated to pay … either *through adjudication or compromise*, … and for litigation, *settlement*, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence provided hereunder …" (emphasis added). Since Uniroyal incurred its $9 million liability to the settlement fund and its $3 million in defense costs as a result of "litigation" ending in "compromise," Home is bound to pay those sums, provided the occurrence was covered by the policy.

Second, Home's contention would place settling defendants in the hopelessly untenable position of having to refute liability in the underlying action until the moment of settlement, and then of turning about face to prove liability in the insurance action. Often the evidence needed to prove actual injury—such as the tort plaintiffs' medical histories—would be unavailable to the insured. Such a regime would markedly reduce the advantages to the insured of settling: faced with the choice of defending the tort action vigorously or settling it without hope of insurance reimbursement, insureds would tend to choose the former. Settlements expressly disavowing tort liability—such as the one in *Agent Orange*, see 597 F.Supp. 740, 862—would be discouraged lest the express disavowal operate as a waiver of insurance coverage claims. These developments would "conflict with the policy, which pervades all areas of the law, of encouraging settlement wherever it is possible." *Paliaga v. Luckenbach Steamship Co.*, 301 F.2d 403, 409 (2d Cir. 1962). In times of severe pressure on courts overwhelmed with litigation, and undersupplied with resources, a rule forcing more cases to trial would be a self-inflicted wound of suicidal import.

Third, the law is clear that a reasonable settlement binds the insurer to indemnify.

The parties have stipulated that Uniroyal's settlement of the *Agent Orange* class action was reasonable. It is undisputed that Uniroyal notified Home of the litigation, its defense, and the settlement discussions, and invited Home to participate. Home declined to defend the action or participate in the settlement discussions. New York law holds clearly that where

> the indemnitor declines to defend the proceeding, and the indemnitee is therefore required to carry that burden, then the indemnitor is conclusively bound by any reasonable good faith settlement the indemnitee may make ...

*Feuer v. Menkes Feuer, Inc.*, 8 A.D.2d 294, 187 N.Y.S.2d 116, 121 (1st Dept.1959) (citations omitted). In *Horn Construction Co., Inc. v. MT Security Service Corp.*, 97 A.D. 2d 786, 468 N.Y.S.2d 415 (2nd Dept.1983), the court relied on *Feuer* to hold that "[i]n the current indemnification action, defendants are bound by any reasonable good faith settlement made by the current plaintiff in the earlier action." *Id.*, 468 N.Y. S.2d at 416. Applying New York law, the Second Circuit recently expressly rejected Home's position:

> In order to recover the amount of the settlement from the insurer, the insured need not establish actual liability to the party with whom it has settled "so long as ... a potential liability on the facts known to the [insured is] shown to exist, culminating in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the [insured]."

*Luria Brothers & Co., Inc. v. Alliance Assurance Co., Ltd.*, 780 F.2d 1082, 1091 (2d Cir.1986) (citation omitted) (elipses and brackets in original). *Accord, Dayton Independent School District v. National Gypsum Co.*, 682 F.Supp. 1403, 1406–07 (E.D.Tex.1988) (applying New York law) ("A [settling] policyholder, therefore, does not have to prove its actual liability as a prerequisite to obtaining coverage.").

Home insists that because the opt-outs in *Agent Orange* were defeated on summary judgment, *see In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223 (E.D.N.Y.1985), 611 F.Supp. 1267 (E.D.N.Y. 1985), Uniroyal should have refused to settle with the class. The fact that a court made a finding of no liability as to some plaintiffs after the settlement, however, does not make the settlement unreasonable as to other plaintiffs or prevent insurance coverage. The reasonability of the settlement is judged "on the facts known to [the insured] at the time of settlement." *Luria*, 780 F.2d at 1091. *Accord, Valloric v. Dravo Corp.*, 357 S.E.2d 207 (W.Va.1987). Here the district court approved the settlement as reasonable, 597 F.Supp. 740 (E.D. N.Y.1984), several months before the decisions against the opt-outs.

Even a settlement at nuisance value may be reasonable. Although the court of appeals in *Agent Orange* suggested that the settlement was "essentially ... at nuisance value," 818 F.2d 145, 171 (2d Cir.1987), it recognized that the manufacturers faced a small probability of a truly gigantic loss— "in the billions of dollars." *Id.* Under the test enunciated in *Luria*, a settlement is reasonable when it reflects both the probability of loss and the probable size of that loss, as Uniroyal's settlement certainly did. *Cf. Valloric, supra* (settlements at nuisance value may be reasonable and thus entitled to indemnification).

Home relies heavily on *Servidone Construction Corp. v. Security Insurance Co. of Hartford*, 64 N.Y.2d 419, 488 N.Y.S.2d 139, 477 N.E.2d 441 (1985), to argue that actual liability must be shown by a settling insured. *Servidone*, however, required only that the claim settled by the insured be a "covered loss" under the policy, and not that the insured independently prove the truth of the underlying claim. In *Servidone* the Court of Appeals held that a claim of a type excluded by the policy could not be indemnifiable if settled; it never held that an otherwise covered claim, once settled, must be proven anew by the insured.

### D. Occurrence Analysis.

#### 1. Number of occurrences.

■ The number of occurrences is of critical importance to the parties because it

determines the number of deductibles Uniroyal will absorb before being indemnified. Home asks the court to find that each spraying in Vietnam was a separate occurrence. Having gone so far it is hard to see why Home did not insist that each of hundreds of thousands of exposures of veterans to the herbicide was a separate occurrence.

Even under Home's intermediate position, there would be considerably more than twenty thousand occurrences, each subject to at least a $100,000 deductible. The result would be that Home owes no coverage payments to Uniroyal. Uniroyal requests a finding that there was but one occurrence, namely the negligent manufacture and failure to warn for which Uniroyal was potentially liable in the underlying suit. Under this view Uniroyal would be subject to only one deductible.

The focus of the determination of the number of occurrences is the "accident" or "happening" or "event" or "continuous or repeated exposure to conditions" which constitutes the occurrence under the policy. Home argues that the number of occurrences must be determined by reference to the time and place of the ultimate injury. There is no support for such a view.

The policy Home sold to Uniroyal makes clear the distinction between the "occurrence" and the "injury." It specifies that an "occurrence" is an "accident or a happening or event or a continuous or repeated exposure to conditions which ... results in personal injury ... during the policy period." The occurrence is not defined to be the injury; the injury is clearly stated to be the *result* of the occurrence. The plain meaning of the policy language is unambiguous and admits of no other interpretation. If the policy had defined the occurrence to be both the "event and the injury resulting therefrom," Home's position might find some basis, but on the present language it does not. *American Home Products Corp. v. Liberty Mutual Insurance Co.*, 565 F.Supp. 1485, 1488 (S.D.N.Y.1983), *aff'd as modified*, 748 F.2d 760 (2d Cir. 1984) ("*AHP*"), upon which Home relies for its position, did not address the ques-

tion of the number of occurrences. Rather, *AHP* examined the meaning of "injury" to determine when an injury took place and thus which of several consecutive insurance policies was triggered. *See id.*, 748 F.2d at 763. Moreover, the policy language construed in *AHP* is inapposite for evaluating the number of occurrences here, because it defined the occurrence to be the very "injury, sickness, or disease," *id.* at 762, in contrast to the "event which results in injury" definition purchased by Uniroyal. If Home's analysis collapsing occurrence and injury were correct then each veteran's exposure would be the occurrence.

Other courts interpreting similar policy language have also distinguished the "occurrence" from its resultant "injury." Examining a definition of occurrence identical to the one at issue here, the court in *Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d 374 (6th Cir.1984), observed:

> The vast majority of courts ... have concluded that although injury must be suffered before an insured can be held liable, the number of occurrences for purposes of applying coverage limitations is determined by reference to the cause or causes of the damage and not to the number of injuries or claims. The number and timing of injuries is relevant in addressing the distinct question of the policy period to which each injury will be assigned.
>
> The definitions of "occurrence" in the present insurance policies reflect this approach.... The language makes the [event] constituting the occurrence logically distinct from the injuries which later take place.... We hold that ... the policy terms admit of only one reasonable interpretation.

*Id.* at 379 (extensive citations omitted). *See also Abex Corp. v. Maryland Casualty Co.*, 790 F.2d 119, 127 (D.C.Cir.1986) ("The comprehensive general liability policies expressly distinguish exposure from injury"); *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.*, 676 F.2d

56, 61 (3rd Cir.1982) (examining identical definition of "occurrence" and looking to causal events to determine number of occurrences, while looking to time of injuries to determine policies triggered); *Champion International Corp. v. Continental Casualty Co.*, 546 F.2d 502, 505–06 (2d Cir.1976), *cert. denied*, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977) (same); *Champion International Corporation v. Liberty Mutual Insurance Company*, 701 F.Supp. 409 (S.D.N.Y.1988) (same); *Transport Insurance Co. v. Lee Way Motor Freight, Inc.*, 487 F.Supp. 1325, 1329–31 (N.D.Tex.1980) (same).

The policy language permits the occurrence to be "an accident or a happening or event or a continuous or repeated exposure to conditions." Courts wrestling with such multifold definitions of occurrence have adopted a variety of "tests" to help focus their attention on some common sense understanding of the terms. In *Arthur A. Johnson Corp. v. Indemnity Insurance Co.*, 7 N.Y.2d 222, 196 N.Y.S.2d 678, 164 N.E.2d 704 (1959), the New York Court of Appeals set out the test in this state for the term "accident." *Johnson* reviewed three classes of decisions: those that found a separate "accident" for each "negligent act or omission [which] is the sole proximate cause," those that found a separate "accident" for each injury, and those that found a separate "accident" for each "event of an unfortunate character." *Id.*, 7 N.Y.2d at 227–28, 196 N.Y.S.2d at 683, 164 N.E.2d at 707. The court preferred the "event" test. *Cf. Unigard Insurance Co. v. United States Fidelity and Guaranty Co.*, 111 Idaho 891, 728 P.2d 780, 782 (Ct.App.1986) (reviewing the "causation," "effect," and "functional event" tests, and choosing the latter); Ostrager & Vyskocil, *Occurrence Policy Coverage for Tort Claims*, in Insurance, Excess, and Reinsurance Coverage Disputes 1988 at 133, 140–56 (B. Ostrager & T. Newman eds., PLI, 1988) (classifying cases into "cause" and "effects" tests); Hourihan, *Insurance Coverage for Environmental Damage Claims*, 15 Forum 551, 559–62 (1980) (perceiving five tests).

The *Johnson* court adopted the "unfortunate event" test as the best because it "corresponds most closely with what the average person anticipates when he buys insurance and reads the 'accident' limitation in the policy." *Johnson*, 7 N.Y.2d at *229, 196 N.Y.S.2d at 684, 164 N.E.2d at 708. The *Johnson* "unfortunate event" test for an "accident" policy was extended to a policy covering "occurrences" in *Hartford Accident & Indemnity Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1973). The Court of Appeals in *Wesolowski*, confronted with a dispute over coverage for a multiple-collision automobile accident, noting that the term "occurrence" might differ from "accident," nevertheless saw "no occasion to find any difference between the two nouns for present purposes." *Id.*, 33 N.Y.2d at 173 n. 1, 350 N.Y.S.2d at 899 n. 1, 305 N.E.2d at 910 n. 1.

The policy language purchased by Uniroyal requires a broader understanding of "occurrence" than in *Johnson* and *Wesolowski*. The policies involved here plainly state that "occurrence" is not identical to "accident," but includes "accident" as well as "event," "happening," and "continuous or repeated exposure to conditions." The insurance industry developed this newer "occurrence" definition in order to provide clearly for coverage of gradual, continuous, and prolonged events that might have been excluded by the instantaneous connotation of "accident." *See AHP*, 565 F.Supp. 1485, 1501 (S.D.N.Y.1983), *aff'd as modified*, 748 F.2d 760 (2d Cir.1984). *Accord, Newmont Mines Ltd. v. Hanover Insurance Co.*, 784 F.2d 127, 135–36 (2d Cir.1986) ("occurrence" provides broader coverage than "accident"); *Burroughs Wellcome Co. v. Commercial Union Insurance Co.*, 632 F.Supp. 1213, 1216–17, 1219 n. 2 (S.D.N.Y.1986) (same); *American Motors Insurance Co. v. E.R. Squibb & Sons*, 95 Misc.2d 222, 406 N.Y.S.2d 658 (Sup.Ct.N.Y.Co.1978) (same).

The "unfortunate event" test is not a category wholly different from the "cause"

test. Neither the *Johnson* nor the *Wesolowski* court provided any guidance, apart from the "average man" aphorism, on how to identify the "unfortunate event" or on how to distinguish among several plausible such events. All that can surely be drawn from those two cases is that the "unfortunate event" is not the "negligent act or omission" and it is not the injury to each victim. The "unfortunate event" is evidently one of the several happenings, with the exception of the negligent act or omission, which precedes and contributes to the resulting injury. Home's counsel recognized this at oral argument, observing that there are "three potential tests ... one is [the] causation test, one is an effects test and one is the event test. The event test is somewhat close to the causation test." Transcript of Motions of Oct. 17, 1988 at 41.

The conception of the "unfortunate event" as one of several possible events contributing to the injury comports well with modern understandings of the scientific causation process. Whereas causes were once imagined as discrete, sequential "but-for" incidents proceeding linearly like billiard balls toward the ultimate injury, it is now believed that a variety of interrelated and intermingled events combine to affect the probability of other happenings. "While causal explanation remains the language of scientific explanation, deductive, firmly delineated causal chains are no longer the paradigm of such explanation.... the probabilistic notion of causation [now] dominates modern science." Brennan & Carter, *Legal and Scientific Probability of Causation of Cancer and Other Environmental Disease in Individuals*, 10 J. Health Politics, Policy & Law 33, 38–39 (1985). *See* Black, *A Unified Theory of Scientific Evidence*, 56 Ford.L.Rev. 595, 624 & n. 140 (1988). Where human observers ascribe causal linkages they do so based on their theories of interactions, not because the "causes" are self-evident. "Causes certainly are connected with events; but this is because our theories connect them, not because the world is held together with cosmic glue." N.R. Hanson,

Patterns of Discovery: An Inquiry into the Conceptual Foundations of Science 64 (1958). The observer distinguishes causation from synchronicity not by simply knowing the truth of nature's mysterious mechanics but by choosing a conceptualization of events as related in one way or another. The "average man" would choose different "unfortunate events" in different contexts.

The "unfortunate event" in the *Agent Orange* context could hence be one of several interrelated causally contributing events; among those are the defective manufacture of dioxin-contaminated herbicides, the delivery of those herbicides to the military, the spraying of the herbicides in Vietnam, and the touching of herbicide molecules to a particular serviceman's skin. Merely identifying the "causation chain" does not help choose among these events. *See Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.*, 505 F.2d 989, 1006–07 (2d Cir.1974); *Airlift International, Ltd. v. United States*, 335 F.Supp. 442, 449 (S.D.Fla.1971), *aff'd mem.*, 460 F.2d 1065 (5th Cir.1972). The defective manufacture may be ineligible as the "negligent act" excluded under *Johnson* and *Wesolowski*, but the other items listed remain in contention.

In this sense, the terms of the definition of "occurrence" are partly ambiguous: they identify a set of possible occurrences, but give little assistance in selecting the proper item from that set. More than one interpretation can reasonably be placed on the terms. The parties have offered no relevant extrinsic evidence to help the court select which is the occurrence. Applying the New York insurance contract construction rules described above, the terms must be construed to favor the insured.

In construing the ambiguous term against the insurer, remaining as faithful to the plain meaning of the policy and the parties' intent as possible, the court finds that the occurrence is the delivery of the herbicides by Uniroyal to the military. Even were the terms not required to be

construed against the insurer, the court finds that this same interpretation is superior to the others and would be chosen by the "average business man" familiar with Uniroyal's trade to whom this case was explained. The delivery was the last act performed by Uniroyal in which it exercised any control over the herbicides. The delivery is also the conceptual point at which Uniroyal set its contaminated herbicides free upon the world to do their damage. After delivery, Uniroyal was barred by the military from any influence over the mixing, transportation, use or safety of Agent Orange. This situation is decidedly different from the context of a civilian sales contract, in which the seller monitors the use of its product and often trains the purchaser's personnel, and in which the seller has some market power to induce safe conduct by the purchaser and the option of a recall to curtail risky uses of the product. With this context in mind, the court finds that the "average informed business man" would perceive the delivery to the military to be the "unfortunate event" invoked by the insurance policy between Uniroyal and Home. As a matter of construing the ambiguity against the insurer, the same result obtains.

An interpretation that spraying be deemed the occurrence would be disadvantageous for insurers as a general rule and could not reasonably have been the intent of these parties at the time of contract. Since the policy was intended to insure Uniroyal for its liabilities, the occurrence should be an event over which Uniroyal had some control. Otherwise, with the covered risks out of the insured's hands and coverage for losses determined by the acts of the unfettered armed forces, the insurer would have no basis for setting premiums *ex ante* and the insurance contract would be illusory. *See* Abraham, *Environmental Liability and the Limits of Insurance*, 88 Colum.L. Rev. 942 (1988) (vanishing availability of environmental liability insurance is due to insurers' great uncertainty as to what losses are being insured against). The court must adopt a standard for the number of occurrences that reflects the policy's meaning and "cannot be result-oriented. It must rest on a principled analysis that is not predisposed to favor insureds or insurers." *Unigard Insurance Co. v. United States Fidelity and Guaranty Co.*, 111 Idaho 891, 728 P.2d 780, 782 (Ct.App.1986).

■ The deliveries by Uniroyal have constituted a single continuous occurrence, a "continuous or repeated exposure to conditions." They were part of a routinized, repetitive process through which a large supply of herbicides was funneled to the military. The number of deliveries was happenstance, determined by the size of available transportation freightcars and in no way by the military's need for 110 separate "pieces" of herbicide. It is worth noting that the view urged by Home—each spraying as a separate occurrence—is untenable for the same reason. The number of sprayings was pure fortuity; planned sprayings depended on military needs, and unplanned sprayings were occasioned by "malfunctions" or "the need of aircraft to escape enemy fire." *In re "Agent Orange" Product Liability Litigation*, 597 F.Supp. 740, 776 (E.D.N.Y.1984). Thus, even if the sprayings might be held to be the occurrence, they were a single continuous occurrence.

Identifying the deliveries as the single continuous occurrence is well supported by similar resolutions in other cases. In *E.B. Michaels v. Mutual Marine Office, Inc.*, 472 F.Supp. 26 (S.D.N.Y.1979), Judge Weinfeld held that the unloading of a vessel over nine days, in which repeated negligent dropping of the grab-buckets inflicted 200 separate holes on the ship's surfaces, was a "series of continuous and interrelated actions [constituting] an 'event of unfortunate character that takes place without foresight or expectation; a single unfortunate occurrence.'" *Id.* at 30 (paraphrasing New York law and *Johnson*). The 200 bucket drops were a single occurrence because

the unloading of the heavy steel scrap obviously could not have been accom-

plished in a single lifting. The cargo was such that continuous liftings over a period of time, in this instance several days, were required to complete the discharge. Unloading the cargo was a unified and continuous function until completion.

*Michaels,* 472 F.Supp. at 29.

The identical characterization is appropriate to the delivery of Agent Orange. It could not have been accomplished in one batch, because the large quantity purchased necessitated numerous freightcar loads. Continuous shipments over a period of time, in this case months, were required to complete the supply the military needed. Shipment was a uniform, routinized, almost daily function until completion.

Relying in part on *Michaels,* the court in *Unigard Insurance Co. v. United States Fidelity and Guaranty Co.,* 111 Idaho 891, 728 P.2d 780, 782 (Ct.App.1986), applied the "functional event" test to a snow clearing operation which separately damaged 98 storage shed doors over four hours. The court found the event to be "continuous and repetitive" and therefore held it was a single occurrence. *Id.* 728 P.2d at 783. *See also Weissblum v. Glens Falls Insurance Co.,* 31 Misc.2d 132, 219 N.Y.S.2d 711 (N.Y. City Ct., Trial Term, Bronx Co.1961) (following *Johnson,* damage to 189 light fixtures during repair of 4500 windows held to be one occurrence).

Finding a single continuous occurrence is especially apt in cases, like *Agent Orange,* of mass deliveries of hazardous products ultimately imposing damage on large numbers of people. In *Household Manufacturing, Inc. v. Liberty Mutual Insurance Co.,* slip op., No. 85–C–8519 (N.D.Ill. Feb. 10, 1987) [1987 WL 6611], the court applied New York law to multiple separate deliveries of defective plumbing units. It held that the "numerous shipments" on a "mass basis" in which "it was anticipated that any defects in the system would affect a large number of persons in the chain of distribution" were a unitary " 'continuous and repeated exposure' to the same conditions."

In *American Universal Insurance Co. v. McCloskey Varnish Co.,* slip op., No. 83–5161 (E.D.Pa. Mar. 19, 1985), the insured had manufactured and sold defective resins over a year-long period to a distributer, who had in turn sold the resins to customers. The court found the practice of supplying the distributor to be a single occurrence, rejecting the view that each shipment or each ultimate injury was a separate occurrence. In *Cargill, Inc. v. Liberty Mutual Insurance Co.,* 488 F.Supp. 49 (D.Minn.1979), *aff'd,* 621 F.2d 275 (8th Cir. 1980) (per curiam), the manufacturer of a nutrient medium for cultivating erythromycin (a pharmaceutical drug) negligently altered the composition of the "Grits 3500" nutrient. The insurer urged that each sale of the defective Grits 3500 was a separate occurrence. The court held that "there was but one occurrence, even though numerous production 'batches' of erythromycin were affected." *Id.* at 53. In *Champion International Corp. v. Continental Casualty Co.,* 546 F.2d 502 (2d Cir.1976), *cert. denied,* 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977), the court found 1400 installations of defective paneling to constitute one continuous and repeated occurrence. In *Union Carbide Corp. v. The Travelers Indemnity Co.,* 399 F.Supp. 12 (W.D.Pa.1975), the insured manufactured a defective resin-former oil. The court observed that "[b]ecause this manufacturer was dealing in bulk raw materials it is regularly foreseeable that any defect in the product or negligence in its manufacture would affect a large number of divers persons in the chain of distribution." *Id.* at 17. One insurer urged a single occurrence, while a second insurer urged multiple occurrences. The court found one accident to have occurred, encompassing all sales of the product. *Id.* at 21. Finally, in *Grand River Lime Co. v. Ohio Casualty Insurance Co.,* 32 Ohio App.2d 178, 289 N.E.2d 360 (Franklin Co.1972), a class action had been brought by 200 persons against the insured for personal injuries due to seven years of air pollutant emissions from the insured's quarrying and manufacturing op-

erations. The court held that the entire course of pollution was a single "injurious exposure to conditions," a single occurrence "encompass[ing] a period of time." *Id.*, 289 N.E.2d at 365.

The facts of the present case fit squarely in this line of cases. Uniroyal manufactured Agent Orange in bulk, shipped numerous batches to a distributor in the person of the military, and knew that the herbicide would later be sprayed over large sections of Vietnam with the potential to expose large numbers of people to any injurious defects in its formula. The allegedly injurious exposure to Agent Orange administered by spraying precipitated a class action. These kinds of events constitute a single "continuous or repeated exposure to conditions" under Uniroyal's policies. Although some of the mass product hazard cases just cited were not decided under the "unfortunate event" test, they all analyze fact situations closely analogous to that in *Agent Orange*, and policy terms similar if not identical to those purchased by Uniroyal. The cases that do not rely on the "unfortunate event" test rely on the cause test, with which the event test is closely associated, as already noted. The "unfortunate event" test is also strictly speaking an interpretation of only the "accident" term, whereas most of these cases apply the alternate "continuous or repeated exposure to conditions" language also available to Uniroyal.

Cases involving property damage also lend support to finding a single occurrence here. For example, in *Gruol Construction Co. v. Insurance Co. of North America*, 11 Wash.App. 632, 524 P.2d 427 (1974), the insured's construction project was damaged by dry rot due to negligent piling of dirt against the building. The court held the five-year period of rot to be one occurrence under the "continuous or repeated exposure to conditions" language.

Lastly, the "continuous or repeated exposure to conditions" language has been held to make one occurrence of a pervasive policy undertaken by the insured over several years. *See Appalachian Insurance Co. v. Liberty Mutual Insurance Co.*, 676 F.2d 56 (3rd Cir.1982) (four years of employment discrimination); *Transport Insurance Co. v. Lee Way Motor Freight, Inc.*, 487 F.Supp. 1325, 1329 (N.D.Tex.1980) ("generalized discriminatory practices routinely followed"). Uniroyal's generalized, routine policy and practice of shipping contaminated herbicides for seventeen months may be classified as a continuous occurrence under this rubric.

Home points to certain cases with conflicting results. The court in *Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d 374 (6th Cir.1984), confronted with several shipments of a toxic chemical improperly packaged in livestock feed bags, found them to be separate occurrences. The decision is notable first because it is quite strong support for the present finding that it is the shipment that constitutes the occurrences, not the feeding of the chemical to the animals (which would be analogous to the spraying of Agent Orange). The *Michigan Chemical* opinion is conclusory on the issue of whether the shipments constituted a single or multiple occurrences: it simply states that the shipments were distinct and not continuous, without explaining why. *See id.* at 383. It leaves to the district court on remand the task of determining the number of shipments, *id.*, suggesting that the court of appeals had little information before it on the practice of shipments.

Unlike *Michigan Chemical*, here full information on the Agent Orange delivery process is available. It is apparent that the herbicide deliveries were so numerous, uniform, routinized and regularized, at such steady and frequent intervals, that they merged into one continuous and repeated event. As one commentator has remarked in a similar context, when "the individual acts that comprise occurrences are repeated with such frequency—indeed, on a daily basis for six years—[then] they appear to lose their distinctiveness and ... merge" into one continuing occurrence. Rodburg & Chesler, *Beyond the Pollution Exclusion: Emerging Parameters of Insurance Coverage for Superfund Liability*, in PLI, Hazardous Waste Litigation 1985 at 347, 374 (1985). The same factors

of numerosity and routinized frequency distinguish the present case from *Maurice Pincoffs Co. v. St. Paul Fire and Marine Insurance Co.*, 447 F.2d 204 (5th Cir.1971) (each of eight distinct sales of contaminated bird seed held to be a separate occurrence), *Home Indemnity Co. v. City of Mobile*, 749 F.2d 659 (11th Cir.1984) (each of several distinct drainage failures causing flooding held to be a separate occurrence), and *Mason v. Home Insurance Co. of Illinois*, 177 Ill.App.3d 454, 126 Ill.Dec. 841, 532 N.E.2d 526 (1988) (each of approximately 35 servings of patty melt sandwiches contaminated with botulinal toxin held to be a separate occurrence). Finally, Home's reference to *Maples v. Aetna Casualty and Surety Co.*, 83 Cal.App.3d 641, 148 Cal.Rptr. 80 (1st Dist.1978), is misplaced, since that decision construed a policy lacking any "continuous event" clause, and since it applied a variant of the "effects" test specifically rejected in New York by *Johnson* and *Wesolowski.*

In addition to the first sentence of the Uniroyal policies' occurrence clauses defining an occurrence as "an accident or a happening or event or a continuous or repeated exposure to conditions," the second sentence of the clauses independently establishes that "[a]ll such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence." To the extent that the deliveries of the contaminated herbicides stemmed from a policy adopted at Uniroyal's headquarters (or another single location), the court may find one occurrence. In *Transport Insurance Co. v. Lee Way Motor Freight, Inc.*, 487 F.Supp. 1325 (N.D.Tex.1980), the court held that under identical policy language "a continuous company-wide policy traceable to the decisions and procedures made at [the insured's] headquarters ... emanated from one location" and constituted a single occurrence. *Id.* at 1329.

Other provisions of the policies Uniroyal purchased underscore the single occurrence holding. The policies contain large "per occurrence" deductibles and aggregate limits, as opposed to "per claim" terms. The "per occurrence" terms are evidence that the parties anticipated each covered occurrence to be a large event resulting in numbers of claims and large net losses, rather than a small event or an individual injury itself. *See Newmont Mines Ltd. v. Hanover Insurance Co.*, 784 F.2d 127, 136 (2d Cir.1986); *Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d 374, 379 (6th Cir.1984); *Champion International Corp. v. Continental Casualty Co.*, 546 F.2d 502, 505–06 (2d Cir.1976), *cert. denied*, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977); *Burroughs Wellcome Co. v. Commercial Union Insurance Co.*, 632 F.Supp. 1213, 1221 (S.D.N.Y.1986); *Owens–Illinois, Inc. v. Aetna Casualty and Surety Co.*, 597 F.Supp. 1515, 1527 (D.D.C.1984); *Transport Insurance Co. v. Lee Way Motor Freight, Inc.*, 487 F.Supp. 1325, 1329 (N.D.Tex.1980). Home's proposal that each spraying constituted an occurrence—yielding over twenty thousand occurrences and an average per occurrence net loss of around five hundred dollars—would make the per occurrence deductibles of over $100,000 monstrously unfair to the insured. Such a construction strains the policy beyond what the parties might reasonably have intended.

One piece of extrinsic evidence was offered by Home to suggest that the parties had contemplated small net losses per occurrence: in automobile accidents involving Uniroyal's liability for defective tires, Uniroyal has apparently treated each automobile collision as a separate occurrence. Thus Uniroyal often assumed the entire loss itself when it fell below the per occurrence deductible, rather than attempting to combine collisions caused by the same batch of tires into one large occurrence. Home argues that this practice implies that each spraying should be an occurrence. Home's argument is unavailing for two reasons. First, the *Agent Orange* context is substantially different from the car accident context. Car accidents take place at discrete times and are made known individually to the potential tortfeasor. The victims of each accident are identifiable; each typically brings a separate suit against the tire manufacturer. Although the treat-

ment of each such accident as one occurrence may be financially unwise for the insured, it makes common sense as a record-keeping practice. In *Agent Orange,* in contrast, the course of spraying produced numerous indistinguishable injuries. It would be impossible to attribute each injured veteran, and each shipment from Uniroyal, to each specific spraying sortie. *See Agent Orange,* 597 F.Supp. at 816–42 (indeterminacy of plaintiffs and defendants). The plaintiffs brought their claims as a class. Thus the same common sense considerations counsel treatment of *Agent Orange* as a single large occurrence.

Second, Uniroyal's automobile accident practice has no legal bearing on the treatment of larger, complex claims like *Agent Orange.* In *Cargill, Inc. v. Liberty Mutual Insurance Co.,* 488 F.Supp. 49 (D.Minn. 1979), *aff'd* 621 F.2d 275 (8th Cir.1980) (per curiam), the court encountered a similar argument and replied:

> [E]ven assuming similarity among the claims, the failure of an insured to submit a claim to an insurer is ambiguous. There are many reasons, apart from a belief that the policy affords no coverage, which may cause an insured to handle a claim itself. It is worthy of note that the great majority of the claims listed ... are pressed by individuals for comparatively small amounts. As a matter of customer relations, [the insured] might have wished to deal with these types of claims itself.

*Id.* at 53. The same analysis applies with equal force to Uniroyal's handling of its tire defect cases. Home's extrinsic evidence thus raises no issue of credibility and suggests no reasonable alternative inference. Summary judgment and a final judgment on the submitted facts remain appropriate.

2. Trigger of Coverage.

■ Distinct from the events constituting the occurrence is the injury resulting from those events. As described at the outset of the section on the number of occurrences, *supra,* the "occurrence" and the "injury" it produces need have no relation to each other in time or place. The

policies sold by Home to Uniroyal cover each event which "results in personal injury, property damage or advertising liability during the policy period." Hence the policy is invoked, or "triggered," when the time of the injury is within the effective dates of the policy; the time of the "occurrence" producing the injury is irrelevant to the triggering of a policy. *See Michigan Chemical Corp. v. American Home Assurance Co.,* 728 F.2d 374, 379 (6th Cir. 1984); *Independent Petrochemical Corp. v. Aetna Casualty and Surety Co.,* 654 F.Supp. 1334, 1359 (D.D.C.1986) *("IPC")* (when the occurrence is a continuous exposure to conditions, "the initial contamination need not happen during any particular policy period in order to trigger coverage. What is important, is whether the policy was in place at the time exposure to the dioxin caused injury in fact."); *Sandoz, Inc. v. Employer's Liability Assurance Corp.,* 554 F.Supp. 257, 265 (D.N.J.1983) ("It is bodily injury, resulting during the policy period, that is the event that triggers liability. ... the 'occurrence' that causes the injury, need not fall within a policy period for that injury to be covered by the policy.").

The issue of trigger of coverage usually arises when several different insurers have, in sequence, insured a company whose products caused injuries at different or uncertain times. In the present case, all five of Uniroyal's policies from 1965 to 1976 were written by Home. The issue of trigger arises in this case because Home's policy deductibles and aggregate limits changed from policy to policy. It is therefore important to decide which of the five policies, if any, was triggered by injury deemed to have resulted from Agent Orange.

Courts have adopted several different trigger theories. Principal among these are the exposure theory, the manifestation theory, the continuous or multiple trigger theory, and the injury in fact theory. *See* Developments in the Law, *Toxic Waste Litigation: Bankruptcy and Insurance Issues,* 99 Harv.L.Rev. 1458, 1579–81 (1986) (summarizing theories). It is quickly be-

coming a settled rule among federal courts that New York law requires the injury in fact theory under a comprehensive general liability policy. Under that theory, "coverage [is] based upon the occurrence during the policy period of an injury in fact." *American Home Products Corp. v. Liberty Mutual Insurance Co.*, 748 F.2d 760, 764 (2d Cir.1984) ("*AHP*"). Thus under New York law " 'a real but undiscovered injury, proved in retrospect to have existed at the relevant time, would establish coverage, irrespective of the time the injury became [diagnosable].' " *Id.* at 766 (quoting *AHP*, 565 F.Supp. 1485, 1497 (S.D.N.Y. 1983)). *Accord Abex Corp. v. Maryland Casualty Co.*, 790 F.2d 119, 121, 124–26 (D.C.Cir.1986) (*AHP* properly states New York law as to trigger of coverage); *Independent Petrochemical Corporation v. Aetna Casualty and Surety Company*, 654 F.Supp. 1334, 1357–58 (D.D.C.1986) ("IPC") (*AHP*'s injury in fact theory continues to correctly state New York law); *cf. Aetna Casualty & Surety Co. v. Abbott Laboratories, Inc.*, 636 F.Supp. 546, 548–49 (D.Conn.1986) (*AHP* correctly states New York law, but its trigger analysis "was based not on New York law but on the court's reading of the actual policy language," making its analysis applicable to all similar policy language in any state).

The "real" injury in fact seized upon in *AHP* evidently means the moment that a foreign molecule causes an insult to human tissue. "Depending on the facts of each case, the chemical involved, the period and intensity of exposure, and the person affected, an injury [in fact] may occur in this sense upon exposure, at some point in time after exposure but before manifestation of the injury, or at manifestation." *IPC*, 654 F.Supp. 1334, 1358 (D.D.C.1986). Although the *AHP* court was hopeful that "[i]n many cases, the onset of injury ... will be possible to pinpoint with great certainty, since the time of such an [injury] will be simultaneous with exposure or manifestation," that court recognized that in "many cases" precision would be impossible and allowed that "all that is necessary is reasonably reliable evidence that the injury ... more likely than not occurred during a period of

coverage." *AHP*, 565 F.Supp. at 1509, *aff'd as modified*, 748 F.2d 760, 764 (2d Cir.1984).

Notwithstanding the *AHP* court's optimism, the feasibility of identifying, even approximately, the time of injury in fact in many modern toxic tort cases must be in serious doubt. The etiology of numerous diseases resulting from toxic substances is only roughly understood. Many injuries are not distinct events, as the *AHP* courts assumed, *see Aetna v. Abbott Laboratories*, 636 F.Supp. at 549 n. 5, but are continuous or gradual insult-inducing processes. These processes take time as the "foreign matter ... remains *in situs* until tissue damage ... is significant enough to be detected." *Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034, 1057–58 (D.C.Cir.1981) (Wald, J., concurring in part), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1981). This insult-in-residence process is elusive of retrospective identification. "[I]t is almost impossible for a doctor to look back and testify with any precision as to when the development of asbestosis 'crossed the line' and became a disease." *Insurance Co. of North America v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212, 1218 (6th Cir.1980). The *AHP* court's permission to rely on "reasonably reliable evidence that the injury ... more likely than not occurred during a period of coverage," *AHP*, 565 F.Supp. at 1509, is of little use when the time of injury in fact is close to the transition date between two policies, precisely when the question would be most keenly disputed and most in need of resolution. *Accord* Developments in the Law, *Toxic Waste Litigation: Bankruptcy and Insurance Issues*, 99 Harv.L.Rev. 1458, 1579 n. 43 (1986) (*AHP*'s rule is "of limited usefulness"). *AHP* rests at base on an idealized notion of scientific causation, in which discrete events cause discrete injuries. As pointed out, *supra*, in connection with the definition of an "event," this is no longer an adequate understanding of causation. *See* Black, *A Unified Theory of Scientific Evidence*, 56 Ford.L.Rev. 595 (1988); Brennan & Carter, *Legal and Scientific Proba-*

*bility of Causation of Cancer and Other Environmental Disease in Individuals,* 10 J. Health Politics, Policy & Law 33, 38–39 (1985). *AHP* also relies on the traditional idea that an "effect never precedes its cause," 748 F.2d at 765. Even that proposition is open to doubt when cause and effect continuously interact in time as micro-unobservable-damage and a continuing infusion of marginal amounts of toxic substances intermingle in time and space. The differential calculus of toxic chemical induced diseases is not amenable to bright-line legal analysis.

In the *Agent Orange* class action, the plaintiffs faced difficulties attempting to prove that their injuries were the result of Agent Orange exposure. *See Agent Orange,* 597 F.Supp. at 782–95 (summarizing problems in proving causation). It would likewise be quite difficult for Uniroyal to prove the time at which exposure to Agent Orange resulted in injury in fact, and to prove that time for each of the 2.5 million class members. In his affidavit, Dr. James R. Olson asserted:

> *[I]f* exposure to TCDD as was present in 'Agent Orange' were assumed to be causally related to any adverse health effects observed in a Vietnam veteran, injury attributable to TCDD more probably than not occurred at the time of a given exposure to 'Agent Orange' or within several days-weeks of cessation of exposure(s). (Emphasis in original.)

In this case there can be no doubt when the injury must be deemed to have taken place. The parties stipulated that any injury from exposure to Agent Orange took place "at or shortly after a serviceman's exposure to Agent Orange spraying."

The force of the Olson Affidavit and the stipulation is to determine, for the purposes of this insurance litigation, that injury in fact took place within a week or so of spraying. Although this determination is not precise, it is based on "reasonably reliable evidence that the injury ... more likely than not occurred" at the legally relevant time. *AHP,* 565 F.Supp. at 1509. The evidence is similar in quality to that ad-duced in other toxic tort insurance cases. *See, e.g., Insurance Co. of North America v. Forty–Eight Insulations, Inc.,* 633 F.2d 1212, 1222 (6th Cir.1980) (fixing time of injury as time of exposure because uncontroverted medical testimony asserted that "tissue damage takes place at or shortly after the inhalation of asbestos fibers."). There is no reason to reject this evidence in this action. The enormous record in the *Agent Orange* litigation supports the factual conclusions that follow.

Given the determination of injury shortly after exposure, the trigger of coverage analysis is quite straightforward. The time of exposure, plus approximately one week, can be taken to be the time of injury in fact. The time of spraying, plus a week in which servicemen might encounter herbicide residue, can be used as the time of exposure. Thus injury in fact occurred within approximately two weeks of spraying. Based upon colloquy at the argument of this motion for summary judgment and the information gleaned from years of *Agent Orange* proceedings in this court, the inferences which follow are not subject to dispute: Spraying itself most probably occurred within a week of the arrival of a batch of Agent Orange in Vietnam since the herbicides were in short supply and were sprayed as soon as available. The batches, in turn, probably arrived in Vietnam within three months after they were delivered to the military on the West Coast of North America by the manufacturer, given even slow delivery by sea instead of air. All told, the time of injury in fact was approximately four months after the date of delivery by Uniroyal to the United States military in this country.

Uniroyal's first policy remained in effect until May 1, 1967; its second policy was in effect from May 1, 1967 to May 1, 1970. Uniroyal delivered Agent Orange to the military from October 6, 1966 to March 1, 1968. *See* Stipulated Delivery Schedule. Using the approximate formula that alleged injury in fact took place four months after delivery, the first delivery on October

6, 1966 resulted in injury in fact on or about February 6, 1967, triggering the first policy. The first twenty-three deliveries, the last of which took place on December 6, 1966, all resulted in injuries in fact before May 1, 1967, triggering the first policy. The remaining eighty-seven deliveries, spanning March 9, 1967 to March 1, 1968, all resulted in injury in fact after May 1, 1967 and before May 1, 1970, triggering the second policy. The policies in effect after May 1, 1970, were not triggered.

*E. The War Risk Exclusion.*

■ Home argues that coverage is excluded by the "war risk exclusion." Excepted from the exclusion are "occurrences taking place in the United States ... or Canada." The clause provides:

> [The policy shall not apply,] except in respect of occurrences taking place in the United States of America, its territories or possessions, or Canada, to any liability of the insured directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities, (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority.

Under New York law, "Exclusions or exceptions from coverage 'are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction.'" *Board of Education v. CNA Insurance Co.*, 647 F.Supp. 1495, 1503 (S.D.N.Y.1986) (quoting *Seaboard Surety Co. v. The Gillette Co.*, 64 N.Y.2d 304, 311, 486 N.Y.S.2d 873, 876, 476 N.E.2d 272, 275 (1984)).

The short answer to Home's argument is that the court has held, *supra*, that the occurrence was the continuous course of deliveries by Uniroyal to the government in the United States. The war risk exclusion is inapplicable to "occurrences taking place in the United States of America, its territo-

ries or possessions, or Canada." Coverage is therefore not barred by this clause.

This outcome does not vitiate the purposes of the war risk exclusion. Had Uniroyal delivered its product directly to a foreign combat zone, instead of to United States armed forces custody in North America, the exclusion would arguably have been applicable. This distinction makes good sense: delivery to the foreign combat zone would probably entail greater risks and less foreseeable liabilities. Once the military took control of the product in North America, Uniroyal had nothing to do with the use of the herbicides in war. In any event, the exclusion language was drafted by Home, and if it did not wish to draw such a distinct line exempting all occurrences in the United States and Canada, it need not have written that exception into the exclusion.

Even if the occurrence had taken place abroad, the exclusion would arguably remain inapplicable to the present case. Although no case has come to the court's attention interpreting this clause under New York law, amicus briefs submitted by Diamond Shamrock have drawn attention to the pending action *Diamond Shamrock Chemicals Co. v. Aetna Casualty and Surety Co.*, No. C–3939–84 (N.J.Sup.Ct., Morris Co. Chancery Div.) (Stanton, J.). That case involves an Agent Orange manufacturer suing its insurers for coverage of its *Agent Orange* settlement costs, just as does the present action. By order of Oct. 18, 1987, filed Oct. 19, 1987, the New Jersey court granted the insured's motion for summary judgment with respect to the war risk exclusion. No opinion was published, but the court orally explained its reasoning at length:

> The reason—the functional reason—why war risk clauses have been invented, is that what has significantly caused the damage, where they are effectively applied, are hostile acts in time of war, and it is not the intention of the insurer to cover for that ... So, the war risk clause is designed to exclude injuries that are caused by one person who is hostile to another striking out at the other human being.... But, of course,

those acts are not ... the kind of acts which were involved in this case.

... the problem with the product [Agent Orange] was not that it was being used by one human being to strike out at another, the problem with the product was that it was defectively made, so that even when used as intended, it inflicted injury on the people who were using it or on those people who were friendly to them.

Transcript of Motions for Summary Judgment, Oct. 2, 1987, at 36–38, in *Diamond Shamrock Chemicals Co. v. Aetna Casualty and Surety Co.*, No. C–3939–84 (N.J. Sup.Ct., Morris Co. Chancery Div.), appended to Orders of Oct. 18, 1987, filed Oct. 19, 1987, and submitted in the present action by letter of William E. Hegarty, counsel for amicus curiae Diamond Shamrock Chemicals Co., dated Oct. 22, 1987.

■ According to the New Jersey court's interpretation of the clause, it was intended to bar coverage for liabilities arising out of hostile acts in wartime. The clause was not intended to bar coverage for product defects peacefully produced in plants in Canada that led to injury during a war far removed in location. Transcript of Motions for Summary Judgment, Oct. 2, 1987, at 42. Similarly, *Airlift International, Ltd. v. United States*, 335 F.Supp. 442 (S.D.Fla.1971), *aff'd mem.* 460 F.2d 1065 (5th Cir.1972), dealt with tortious injury taking place in Vietnam during the war. A civilian aircraft on a mission over Vietnam, under contract to the United States military, collided with a United States military aircraft. The court held the crash to be an "air peril," not a "war risk," and therefore denied coverage to the civilians under the government's war risk indemnification policy. *Id.*, 335 F.Supp. at 448–49. In both *Airlift* and *Diamond Shamrock*, the courts are looking to the nature of the risks intended to be included in "war risk" clauses, and limiting those clauses to liability sustained as a result of hostilities.

This interpretation is a reasonable one, though not the only reasonable construction. Given the failure of the parties to offer any extrinsic evidence as to the meaning of the clause, the court is compelled to construe the exclusion strictly against the insurer and in favor of the insured.

There is also a question as to whether Home is collaterally estopped from asserting its war risk exclusion in the present action by Uniroyal. Home was also a party to the New Jersey action, where it raised its war risk exclusion against Diamond Shamrock's *Agent Orange*-based claims. Home appeared at the oral argument there and had the opportunity to submit affidavits and briefs. The New Jersey court's order granting summary judgment against Home's war risk exclusion may bar Home's use of that clause in further *Agent Orange*-based insurance litigation. We need not so find in this case.

*F. Allocation of Coverage.*

■ Because one continuous occurrence spanning two policy periods has resulted in injuries in fact triggering both of those policies, an appropriate method for allocating the net losses among the two policies must be devised. The court is aware of four methods: "stacking" the policies, finding each policy to be jointly and severally liable for the entire loss, allowing the insured to choose the policy it prefers, and allocating the losses to each policy according to the proportion of injuries triggering that policy. Only the last method makes sense in this case.

"Stacking" would permit the insured to add the two policies' aggregate limits and deductibles together and apply that total to the net loss suffered by the insured. Here, for each occurrence, the first policy triggered covers up to $6 million with a $100,000 deductible, and the second covers up to $10 million with a $100,000 deductible. Stacked together the policies would cover $16 million per occurrence with a $200,000 deductible per occurrence. This method improperly divorces the coverage from the injuries triggering the coverage; it simply lumps all the injuries into one large pool. In addition, it fails to distinguish what portion of the $16 million would come from each policy if each were written by a different insurer. Finally, even with the same

insurer on both policies, stacking in this manner makes the aggregate limits and the separately negotiated premiums for each policy illusory by expanding coverage to the sum of both policies. In the usual case, where injuries are clearly assignable to one policy or the other, the insured might fall below its aggregate cap in one policy but exceed it in the other. In that event the insured would receive full indemnity in the first period and part in the second. By stacking, the insured could circumvent the maxima to demand full indemnity for all its losses.

Joint and several liability was the approach adopted in *Keene Corp. v. Insurance Co. of North America,* 667 F.2d 1034 (D.C.Cir.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1981). *Keene* first rejected a pro rata allocation scheme because for one period the manufacturer had had no insurance, and the *Keene* court viewed its mission as ensuring that the manufacturer received complete indemnity for all its asbestos-related losses. *Id.,* 667 F.2d at 1048–49. A firm that fails to purchase insurance for a period, however, is self-insuring for all the risk incurred in that period; otherwise it would be receiving coverage for a period for which it paid no premium. Self-insurance is called "going bare" for a reason. *See* Developments in the Law, *Toxic Waste Litigation: Bankruptcy and Insurance Issues,* 99 Harv.L.Rev. 1458, 1584 (1986) (criticizing *Keene*'s allocation method).

*Keene* then adopted joint and several liability against all the insurers. 667 F.2d at 1050. This choice was based on *Keene*'s view that the injuries were continuous over several policies, a view rejected by the injury in fact holding of *AHP,* 748 F.2d 760 (2d Cir.1984). In *Sandoz, Inc. v. Employer's Liability Assurance Corp.,* 554 F.Supp. 257 (D.N.J.1983), the court examined *Keene*'s joint and several liability approach and concluded it was appropriate only "[i]f the medical evidence cannot differentiate between the various periods of coverage," *id.* at 266, since then all the injuries might have occurred in any of the policy periods. *Cf. Gruol Construction Co. v. Insurance Co. of North America,* 11 Wash.App. 632,

524 P.2d 427, 431 (1974) (when the insured "has sustained damages of a continuing nature, ... the burden of apportionment is on the carriers."). Because here the affidavit of Dr. Olson and the undisputed facts permit a clean differentiation of injuries between policy periods, the *Keene* approach is inapposite.

Third, as Uniroyal urges here, the insured might be able to choose the policy it prefers. Language in *Keene* suggests this option. *See* 667 F.2d at 1049–50. This approach could easily be extremely unfair to an insurer who was on the risk for a day but who then is burdened with the entire loss incurred over several years. Certainly such a formulation cannot help correlate risks insured with premiums charged.

The last option, proportional allocation, is the only one that comports with the language of the policies at issue here and with the holding in *AHP.* The insurance policies sold by Home are nearly silent on the allocation issue and give only scant assistance in determining the allocation of numerous injuries from a continuous occurrence. But there are indicia suggesting proportional allocation according to estimated injuries in each period. The definition of "ultimate net loss" includes all sums payable as personal injury claims due to any occurrence covered under the policy, so each policy should be understood to provide coverage for the injuries triggering that policy. According to *AHP,* it is the injuries that trigger a policy. As discussed at length *supra,* the fact that an occurrence takes place at the same time as one or more policy periods is irrelevant to coverage, since it is the time of injury that triggers coverage. Triggering more than one policy is not surprising where many injuries arise from one continuous occurrence. "New York courts have also triggered successive policies in effect during a continuous course of injury." *Dayton Independent School District v. National Gypsum Co.,* 682 F.Supp. 1403, 1410 (E.D. Tex.1988) (citing *National Casualty Ins. Co. v. City of Mount Vernon,* 128 A.D.2d 332, 515 N.Y.S.2d 267 (2d Dep't 1987); *McGroarty v. Great Am. Ins. Co.,* 36 N.Y.

2d 358, 368 N.Y.S.2d 485, 329 N.E.2d 172 (1975)).

For each injury, a policy is triggered. Each time a policy is triggered, the court must look to all the injuries triggering that policy and determine the number of occurrences from which those injuries result. Here under each policy there will be one continuous occurrence. The court must then calculate the losses attributable to those injuries triggering each policy, and apply the per occurrence deductible and maximum once to each occurrence under each policy. This is exactly the method the court would apply if there were multiple occurrences. *See* Developments in the Law, *Toxic Waste Litigation: Bankruptcy and Insurance Issues*, 99 Harv.L.Rev. 1458, 1584 n. 66 (1986) (describing proportional allocation scheme). No hardship should be imposed by this method on the insurer, since the insurer contracted for the per occurrence limits under each policy, with the understanding that a large continuous occurrence might cause many injuries under each of several policies.

Other provisions of the policies at issue here also suggest a proportional allocation. The "Other Insurance" clause suggests that if two policies cover the same loss, the Home policy is to be considered only excess insurance above the other policy. Under the injury in fact wizardry of *AHP* each injury is discrete and must be assignable to a separate policy, so, by definition, no losses could be covered by both policies; but conceptually a series of indistinguishable injuries to indeterminate plaintiffs from a continuous occurrence over two policy periods, as here, approaches the notion implied in the "Other Insurance" clause. Here both policies would be Home policies and would therefore purport to be mutually excess. In New York such a result requires pro rata allocation of the loss between the two mutually excess indemnitors. *See Federal Insurance Co. v. Atlantic National Insurance Co.*, 25 N.Y.2d 71, 78–79, 302 N.Y.S.2d 769, 774, 250 N.E.2d 193, 196 (1969) ("As both policies assumed the same risk ... both must contribute, pro rata, toward payment of the cost of the settlement ..."); *Jefferson Insurance Co.*

*of New York v. Glens Falls Insurance Co.*, 88 A.D.2d 925, 450 N.Y.S.2d 888, 890 (2d Dept.1982) (" 'where there are multiple policies covering the same risk, and each generally purports to be excess to the other, the excess coverage clauses are held to cancel out each other and each insurer contributes in proportion to its limit amount of insurance.' ") (citations omitted).

Finally, the "Prior Insurance and Noncumulation of Liability" clause, adverted to by Uniroyal, has no bearing on the present question. The first paragraph of that clause prevents double payment for one loss—a danger which a proportional allocation avoids. The second paragraph applies to "personal injury ... continuing at the time of termination of this policy." Given the Olson Affidavit, stating that each injury in fact occurs shortly after exposure, no injury could be "continuing" after its momentary happening. Under *AHP*, as previously mentioned, personal injuries are discrete events and do not "continue." Though this clause may be relevant to property damage or advertising liability also covered under the policy, the injuries from which might "continue," it is irrelevant in the present setting.

In the absence of information defining the loss attributable to each specific serviceman's injury, the proportional allocation scheme produces a calculation based on proxy estimates. As noted above, the first 23 deliveries resulted in alleged injuries triggering the policy in effect from Feb. 1, 1965 to May 1, 1967. Those 23 deliveries account for approximately 18% of the total gallons of Agent Orange sold by Uniroyal to the military. Gallons may be used as a proxy for exposure, assuming all gallons were on average sprayed in the same manner and potency; and exposure may be used as a proxy for injury, assuming relatively equivalent exposures to each serviceman. The last 87 deliveries, whose corresponding injuries trigger the second policy, account for approximately 82% of the gallons sold by Uniroyal.

If Uniroyal's ultimate net loss is approximately $12.2 million ($9.2 million in settlement funds and $3 million in defense costs,

**1394**

not counting interest), then 18% of that sum, or approximately $2.2 million, is allocated to the first policy. Uniroyal must assume the $100,000 per occurrence deductible, after which it has coverage up to $6 million per occurrence. Therefore it receives $2.1 million under the first policy.

82% of the ultimate net loss amounts to approximately $10 million, allocated to the second policy. Uniroyal must meet the $100,000 per occurrence deductible, after which it may receive up to $10 million in coverage. Therefore Uniroyal is entitled to $9.9 million of coverage under the second policy. (It is pure coincidence that this figure grazes the limit of the aggregate cap of the second policy. If Uniroyal's deliveries had occurred at different times, or if the amount of settlement in *Agent Orange* had been different, this figure would change as well.)

These figures do not account for interest owed. The parties can apply this calculation method to the precise and accurate figures at their disposal and present a specific order to the court.

## IV. CONCLUSION

For the reasons stated, plaintiff Uniroyal is entitled to a declaratory judgment that it must be defended and indemnified for sums it is obligated to pay as a result of *Agent Orange* litigation liabilities, arising out of the single continuous occurrence resulting in personal injury described in this memorandum. Defendant Home's motion for summary judgment is denied. Home is found liable to Uniroyal according to the proportional allocation method described in this memorandum. Home's policy limits are not exceeded. There is no liability of the London excess Insurers.

The parties shall submit proposed final judgments within thirty days.

SO ORDERED.