109 Cal.Rptr.2d 698 (2001)
90 Cal.App.4th 1330
ALPHA THERAPEUTIC CORPORATION, Plaintiff and Appellant,
v.
The HOME INSURANCE COMPANY et al., Defendants and Respondents.
Alpha Therapeutic Corporation, Plaintiff and Appellant,
v.
Associated International Insurance Company, Defendant and Appellant;
Transcontinental Insurance Company et al., Defendants and Respondents.
Alpha Therapeutic Corporation, Plaintiff and Appellant,
v.
Topa Insurance Company, Defendant and Respondent.
Alpha Therapeutic Corporation, Plaintiff and Appellant,
v.
Associated International Insurance Company, Defendant and Respondent.
Nos. B134257, B135081, B138225, B138843.
Court of Appeal, Second District, Division Two.
July 25, 2001.
Review Granted October 17, 2001.
Review Dismissed March 13, 2002.
*700 Troop Steuber Pasich Reddick & Tobey, Kirk A. Pasich, Catherine L. Rivard, Cassandra C. Shivers, Los Angeles; Heller Ehrman White & McAuliffe, Nancy Sher Cohen, Reynold L. Siemens and Carlyle W. Hall III, Los Angeles, for Plaintiff and Appellant Alpha Therapeutic Corporation.
Harrington, Foxx, Dubrow & Canter, Mark W. Flory, Nancy J. Mindel and Angela Lui Walsh, Los Angeles, for Defendant, Respondent and Appellant Associated International Insurance Company.
Kroll, Rubin & Fiorella, James D. Otto and Christine A. Roney, Los Angeles, for Defendant and Respondent The Home Insurance Company.
Ross, Dixon & Bell, Alec M. Barinholtz, Irvine, Rebecca L. Ross, Chicago, IL, Charles I. Hadden, Richard J. Pratt and Jodi L. Cleesattle, Washington, for Defendants and Respondents Transcontinental Insurance Company, London Guarantee and Accident Company of New York and Harbor Insurance Company.
Lord, Bissell & Brook and Jeri Rouse Looney, Los Angeles, for Defendant and Respondent Transport Indemnity Corporation.
No appearance for Defendant and Respondent Topa Insurance Company.
Certified for Partial Publication.[*]
*699 TODD, J.
Alpha Therapeutic Corporation appeals the grant of summary judgment against it on claims to establish coverage for defense and indemnity obligations under successive excess general liability policies issued over a seven-year period. Coverage was denied and summary judgment granted based on the trial court's application of the "anti-stacking" principle, as enunciated in FMC Corp. v. Plaisted & Companies (1998) 61 Cal.App.4th 1132, 72 Cal.Rptr.2d 467 (FMC), limiting recovery to a single year's total policy limits, as well as application of the concept of "qualified time on the risk," which resulted in the single year's total limit being allocated over the seven years of coverage.
We conclude the "anti-stacking" rule was misapplied and the undisputed facts were insufficient to establish that the excess carriers could have no obligation to indemnify Alpha. The judgments will be reversed, and the matter remanded for further proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND
Alpha Therapeutic Corporation was in the business of processing and distributing blood factor concentrates, a substance separated from human plasma which provides reliable and measurable doses of clotting factors used in the treatment of hemophiliacs. Alpha, along with other processors of the factor concentrates, was sued by thousands of hemophiliacs who had used the factor concentrates between 1978 and 1985 and claimed HIV infection from their use during that period.[1]
*701 The physiological phenomenon of HIV infection is that within a short period after infection, the body develops antibodies to the virus. The "assault on the immune system is immediate. The victim suffers from a sudden and serious decline in the number of white blood cells. There is no latency period.... HIV infection [has] ... a constant and detrimental effect on the infected person's hemic and lymphatic systems from the moment of infection." (Bragdon v. Abbott (1998) 524 U.S. 624, 635-637, 118 S.Ct. 2196, 141 L.Ed.2d 540.) The disease process "follows a predictable and, as of today, an unalterable course." (Id. at p. 633,118 S.Ct. 2196.)
Hemophiliacs became infected with HIV from the use of factor concentrates as early as 1978, but there was no licensed test for the presence of antibodies before March 1985. Since 1985 it has been possible to diagnose HIV infection after seroconversion, the point at which antibodies reach a detectable level. Still, there is no test for the actual date of infection and it has not been feasible to determine an individual claimant's actual date of infection because generally no blood samples were retained which might provide evidence of that date and symptoms of infection are not always distinct from those of other illnesses, such as the flu. Furthermore, an infected person may test negative for the presence of HIV antibodies for a period of time after infection. Alpha contends, however, that epidemiological studies have been conducted which provide information concerning the approximate number of HIV seroconversions among the hemophiliac community at any given time between 1978 and 1985.[2]

The Policies
Facing liability for thousands of AIDS-related claims, Alpha sued its insurers to establish their respective defense and indemnity obligations under successive primary and excess general liability polices issued to Alpha for the years 1978 to 1985, sometimes referred to as "Policy Years" 1 through 7. The respondents in these consolidated appeals are excess insurers that collectively provided over half of Alpha's seven-year total "per occurrence" limits. In general these excess insurers provided coverage for sums Alpha became obligated to pay because of "bodily injury" during the policy period, caused by an "occurrence," to the extent those sums exceeded the limits of the underlying primary and any lower-level excess liability coverage.

The Parties' Stipulations
Alpha's suit originally involved additional insurers and issues. After some parties were dismissed,[3] the remaining parties entered into a number of stipulations to facilitate a trial limited to the issue of the proper allocation of the excess insurers' indemnity obligations.
It was stipulated that all of the policies were "triggered," that is, potentially responsible *702 to indemnify the insured, under the "continuous injury" coverage trigger theory adopted in Montrose Chemical Corp. v. Admiral Ins. Co. (1995) 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878 (Montrose).
The parties further stipulated that Alpha's processing, marketing, and sale of factor concentrates allegedly contaminated with HIV constituted a single "occurrence" within the meaning of the policies, that the occurrence continued in each of the seven policy years and caused "bodily injury" during each of the policy years, and that each bodily injury continued from infection1 to the death of the individual or to the present.
The parties stipulated to the amount that Alpha had already paid or agreed to pay for settlements or judgments of AIDS-related claims. The full amount of Alpha's liability to the bodily injury claimants could not at that time be determined because Alpha faced liability as a defendant in a number of separate lawsuits and for additional contributions to a class action settlement.[4]
The parties stipulated to the amount Alpha had received in payments from its insurers. Some insurers had agreed to make certain additional sums available as "coverage-in-place" for AIDS-related claims. Alpha's primary insurance and retained limit had been exhausted. Some excess insurers had paid their full policy limits, but others had settled for less than their limits or had become insolvent.[5] For purposes of the court's allocation determination, Alpha assumed responsibility for the difference, agreeing that the respondent excess insurers would not be liable "for indemnifying Alpha against liabilities which do not exceed the inception points of the policies issued by those carriers when those liabilities are properly allocated."[6]

The Summary Judgment Motion
Instead of a trial on the issue of allocation based on the stipulations, the excess insurers moved for summary judgment. They argued that although Alpha had purchased seven consecutive years of primary and excess liability coverage with annual *703 "per occurrence" [7] limits, Alpha could not recover up to the total "per occurrence" limits for all policy years because all the bodily injuries resulted from a single "occurrence." The insurers contended that an "anti-stacking rule" adopted in FMC, supra, 61 Cal.App.4th 1132, 72 Cal.Rptr.2d 467 precluded indemnification under successive policies for damages caused by a single "occurrence." They argued that the highest total "per occurrence" limits available for any single policy year ($100 million) was the most Alpha could recover for damages for bodily injuries resulting from a single "occurrence." The excess carriers argued they had no indemnification obligation because Alpha should be deemed to have already received more than that amount by virtue of its settlements with other insurers.
The second prong of the excess insurers' argument was that Alpha's $100 million maximum recovery under the "anti-stacking rule" must then be allocated among all seven triggered policy years. All but one of the excess insurers argued that a "qualified time on the risk" allocation method was mandated under Stonewall Ins. Co. v. City of Palos Verdes Estates (1996) 46 Cal.App.4th 1810, 54 Cal.Rptr.2d 176 (Stonewall), under which Alpha's maximum liability insurance recovery allocated to any given policy year was insufficient to reach their excess layers.
The trial court agreed with the excess carriers argument. It found that the "anti-stacking rule" limited Alpha to indemnity in an amount no greater than the highest total "per occurrence" limits for any single policy year for all bodily injuries caused by the single continuing "occurrence." The court found that the excess insurers that had argued for the "qualified time on the risk" allocation were entitled to summary judgment because after that sum was allocated over the seven years, the liability attributable to the years those excess insurers were on the risk was less than the limits of the underlying insurance. The single excess insurer whose excess layer would have been pierced by "qualified time on the risk" allocation was later found to be entitled to summary judgment on the ground that Alpha had already effectively received more than a single year's per occurrence limits from its other insurers.

The Appeal
Alpha appeals from the judgments in favor of defendants Transcontinental Insurance Company (Transcontinental), Harbor Insurance Company (Harbor) and London Guarantee and Accident Company of New York (London) (these three often collectively referred to by the parties as "CNA"), Transport Indemnity Company (Transport), The Home Insurance Company (Home), TOPA Insurance Company (TOPA), and Associated International Insurance Company (AIIC).[8]

DISCUSSION

A. Principles of Policy Interpretation.
"Insurance policies are contracts and, therefore, are governed in the first *704 instance by the rules of construction applicable to contracts. Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs its interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The `clear and explicit' meaning of these provisions, interpreted in their `ordinary and popular sense,' controls judicial interpretation unless `used by the parties in a technical sense, or unless a special meaning is given to them by usage.' [Citations.] If the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning. [Citations.]" (Montrose, supra, 10 Cal.4th at pp. 666-667, 42 Cal.Rptr.2d 324, 913 P.2d 878.) "`[I]n the insurance context, we generally resolve ambiguities in favor of coverage. [Citations.] Similarly, we generally interpret the coverage clauses of insurance policies broadly, [in order to protect] the objectively reasonable expectations of the insured. [Citations.] These rules stem from the fact that the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications. [Citations.] Because the insurer writes the policy, it is held "responsible" for ambiguous policy language, which is therefore construed in favor of coverage.' [Citations.]" (Id. at p. 667, 42 Cal.Rptr.2d 324, 913 P.2d 878.)
The language of the policies, not abstract concerns about fairness, controls our interpretation: "Beneath the [court's] concern about `fairness' and `justice' is, apparently, a belief that, without an approach like the one it adopted, [the insured] might get a windfall from the insurers. That is not the case. We shall assume for argument's sake that [the insured] has enjoyed great good luck over against the insurers. But the pertinent policies provide what they provide. [The insured] and the insurers were generally free to contract as they pleased. [Citation.] They evidently did so. They thereby established what was `fair' and `just' inter se. We may not rewrite what they themselves wrote. [Citation.] We must certainly resist the temptation to do so here simply in order to adjust for chancefor the benefits it has bestowed on one party without merit and for the burdens it has laid on others without desert. [Citations.] As a general matter at least, we do not add to, take away from, or otherwise modify a contract for `public policy considerations.' [Citation.] ... We shall therefore allow whatever `gains' and `losses' there may be to lie where they have fallen." (Aerojet-General Corp. v. Transport Indemnity Co. (1997) 17 Cal.4th 38, 75-76, 70 Cal.Rptr.2d 118, 948 P.2d 909, fns. omitted.)

B. Policy Provisions Pertinent to the "Stacking" Issue.
Under the policies the excess insurers agreed to indemnify Alpha against "ultimate net loss in excess of and arising out of the hazards covered and as defined and in excess of the underlying insurance," or to indemnify the insured for the amount of loss "which is in excess of the applicable limits of liability of the underlying insurance." "Ultimate net loss" or "loss" is generally defined as "the sums paid in settlement of losses for which the insured is liable after making deductions for all recoveries, salvages and other insurances other than the underlying insurance or policies written to be excess of the excess insurance at issue." A majority of the excess policies either incorporate the insuring agreements of the underlying insurance *705 or purport to "follow form" to that insurance.[9]

1. "Bodily Injury" and "Occurrence"
The basic insuring agreement of the underlying primary policies for Years 1 through 5 requires payment of "all sums" the insured becomes legally obligated to pay as damages because of "bodily injury," caused by an "occurrence." "Bodily injury" is defined as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom." "Occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury ... neither expected nor intended from the standpoint of the insured." (Italics added.)
The Year 6 primary policy is slightly different, obligating the primary carrier to pay "all sums" the insured becomes legally obligated to pay as damages "because of personal injury, including death at any time resulting therefrom...." "Personal injury" is defined to include "[b]odily injury, ... including death resulting therefrom, sustained by a natural person during the policy period." (Italics added.) The Year 6 primary policy does not require that "personal injury" be caused by an "occurrence," although for purposes of other types of covered liability the policy defines "occurrence" as "an event, including continuous or repeated exposure to conditions which results in personal injury...."
For Year 7, the first-level excess policy contains an agreement to pay "all sums" the insured becomes legally obligated to pay as damages because of "personal injury ... caused by an occurrence..." The Year 7 policy defines "personal injury" to include: "bodily injury ... which occurs during the term of this policy including death at any time resulting therefrom...." "Occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results during the term of this policy in personal injury...."
The policies consistently distinguish between the "occurrence" (cause) and the "injury" (the effect) and provide indemnification for damages, not from the occurrence but from the injury. And the parties have stipulated that the "continuous injury" trigger theory of Montrose, supra, is applicable to this case. Under Montrose, successive general liability policies such as these are "triggered" by injury or damage during the policy period, not by an "occurrence" in the abstract that may or may not result in such injury or damage.[10]

2. Limits of Liability Provisions.
The primary policies contain "Limits of Liability" provisions detailing the application of the policies'"per occurrence" limits. The Year 1-5 primary policies provide that regardless of the number of persons injured or claims brought, the "per occurrence" limit of each policy "is the total limit of the Company's liability for all damages because of bodily injury ... sustained by one or more persons ... as the result of any one occurrence." In addition the policies provide, "For the purpose of determining the limit of the Company's liability *706 all bodily injury ... arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." (Italics added.)
The Year 6 primary policy does not contain a Limits of Liability provision deeming all injury arising from continuous or repeated exposure to substantially similar conditions to arise out of a single "occurrence." The Year 7 policy's "Limits of Liability" provision states: "For the purpose of determining the limit of the Company's liability, all personal injury ... arising out of continuous or repeated exposure to substantially the same general condition existing at or emanating from one location or source shall be considered as arising out of one occurrence." (Italics added.)
The Limits of Liability provisions make clear that if a single "occurrence" (for example, an automobile accident or an explosion) results in multiple bodily injuries during the policy period, the applicable policy limits are a single "per occurrence" limit. For purposes of determining whether multiple "per occurrence" limits[11] might be at stake in other situations where there are multiple bodily injuries during the policy period, the policies make clear that all injuries arising out of "continuous or repeated exposure to substantially the same general conditions" will be deemed to have arisen out of a single "occurrence." Under each policy, the "per occurrence" limit is the maximum amount the insurer will pay for damages covered by that policy arising out of a single "occurrence."

C. "Anti-Stacking" Principles Do Not Justify Summary Judgment in Favor of the Excess Carriers.
There is no dispute that Alpha faces liability falling within the scope of coverage of each of the policies. These policies expressly limit the insurers' obligation to pay no more than the "per occurrence" limit for covered damages arising from a single "occurrence." It would appear that this is exactly what Alpha seeks: to be allowed to recover up to each policy's "per occurrence" limits, depending on the evidence concerning the magnitude of Alpha's eventual liability and the timing of the injuries for which it is obligated to pay.
The excess carriers claim that regardless of the ultimate magnitude of Alpha's liability and the timing of the injuries on which that liability is based, because FMC's "anti-stacking rule" prohibits recovery of more than a single year's "per occurrence" limits for all injuries arising out of a single "occurrence," Alpha can never recover the full "per occurrence" limits of each policy. We disagree.
Because insurance coverage depends on the particular terms of the policies at issue, indiscriminate application of "rules" and shorthand labels such as "stacking" are not always helpful. The policies in this case do not define "stacking" or even use the term. Review of authorities from this and other jurisdictions indicates that the term "stacking" has different connotations. Our Supreme Court has stated: "`Stacking* is sometimes defined to mean the recovery by a claimant several times over for his injuries. [Citation.] It has also been held to refer to `the ability of the insured, when covered by more than one insurance policy, to obtain benefits from a second policy on the same claim when recovery from the first policy would alone be inadequate' to compensate for the actual damages suffered. [Citation.]" (Wagner v. State Farm Mutual Auto. Ins. Co. (1985) *707 40 Cal.3d 460, 463, fn. 2, 220 Cal.Rptr. 659, 709 P.2d 462, italics added.)
Neither of these types of "stacking" is necessarily implicated here. Alpha seeks only full indemnification. It does not seek to recover more from the insurers than it will eventually be found to owe to the bodily injury claimants. In moving for summary judgment, the insurers have not attempted to demonstrate that Alpha is seeking to recover multiple policy limits "on the same claim." Alpha faced thousands of individual claims of bodily injury. The insurers have not shown that any single bodily injury claim exceeds the available "per occurrence" limits of any single policy year.

1. The Anti-Stacking "Rule" of FMC Has No Application Here
The insurers argue that the trial court was correct in applying the "anti-stacking rule" enunciated in FMC. They argue the court correctly determined that where all the injuries for which the insured is liable arise out of a single occurrence, Alpha cannot look to the limits of successive polices but is limited to a single year's insurance benefits for all losses caused by that single occurrence. We disagree.
It is clear that FMC did not purport to adopt an anti-stacking rule of broad general application. The outcome in FMC is based on the unique language of the FMC policies and the factual circumstances. The insurers in FMC, referred to as "the London insurers," provided comprehensive or general liability umbrella and excess coverage to FMC Corporation, a manufacturer of equipment and chemical compounds. The insured sought coverage for damages resulting from toxic contamination to soil, surface water and groundwater at numerous separate sites. (FMC, supra, 61 Cal.App.4th at pp. 1142-1143, 72 Cal. Rptr.2d 467.)
At issue in the case were policies for the seven years between 1964 and 1970. The FMC policies obligated the London insurers to indemnify the insured for "all sums" it was obligated to pay as liability for damages "on account of property damage "caused by or arising out of each occurrence." (FMC, supra, 61 Cal.App.4th at p. 1147, 72 Cal.Rptr.2d 467.)
There was no dispute in FMC that Montrose's "continuous injury" trigger, under which "property damage which is `continuous or progressively deteriorating throughout successive policy periods' [would] be covered by `all policies in effect during those periods,'" was applicable to the gradual release of contaminants at the sites. (FMC, supra, 61 Cal.App.4th at p. 1150, 72 Cal.Rptr.2d 467.) The court noted that for each policy triggered under Montrose "`... the insurer's obligation to the policyholder is to cover the policyholder's liability "in full" up to the policy limits. It is irrelevant that only part of the [injury or damage] developed during any single policy period or during a period in which the manufacturer had no insurance. The logical consequence of this ruling is that the policyholder is covered (up to the policy limits) for the full extent of its liability.... [Citations.]' [Citation.]" (Id. at pp. 1182-1183, 72 Cal.Rptr.2d 467, quoting from Armstrong World Industries, supra, 45 Cal.App.4th at p. 57, 52 Cal.Rptr.2d 690.)
As a result, the FMC court perceived that a "stacking" issue was presented by the combination of the Montrose continuous injury trigger and the "all sums" language of the policies as interpreted in Armstrong World Industries. The court noted, for example, that the successive London excess policies provided limits of $1 million for each "occurrence," and "there was only one `occurrence,' based on `a continuous or repeated exposure to conditions', *708 at any particular site. But by application of the continuous injury trigger identified and approved in [Montrose], that single occurrence could be deemed (depending on the facts) to have triggered coverage in more than one, or all, of the policy periods. By application of the `stacking' concept, at any particular site FMC might have aggregated up to $7 million in liability coverage (over and above underlying coverages), for a single occurrence, under London policies which specified a $1 million per-occurrence limit." (FMC, supra, 61 Cal.App.4th at pp. 1188-1189, 72 Cal.Rptr.2d 467, italics added.)
Concluding that such a result would afford more coverage than the insured had bargained or paid for, the FMC court discussed the "anti stacking" concepts set forth in Keene Corp. v. Ins. Co. of North America (D.C.Cir.1981) 667 F.2d 1034 and discussed in Armstrong World Industries, supra, 45 Cal.App.4th 1, 52 Cal.Rptr.2d 690. Both Armstrong and Keene involved coverage issues resulting from asbestos related injuries, which by their nature are cumulative and progressive. As to any particular claim Keene had determined that "only one policy's limits can apply to each injury" and "the insured may select the policy under which it is to be indemnified." (Keene at pp. 1049-1050.) "Armstrong World Industries noted that in the case before it the trial court had ruled, consistent with Keene, that `only one policy's limits can apply to each claim, and the policyholder may select the policy under which it is to be indemnified,' ... [Citation.]" (FMC, supra, 61 Cal.App.4th at p. 1183, 72 Cal.Rptr.2d 467, italics added.)
The FMC court recognized that both Armstrong and Keene had interpreted "stacking" as an attempt to recover under multiple policies for a single injury or claim of injury. The California Supreme Court had described "stacking" in a similar manner in Wagner, supra, 40 Cal.3d at page 463, 220 Cal.Rptr. 659, 709 P.2d 462. But the FMC court's description of stacking and anti-stacking was quite different, quoting from a treatise that employed a different definition and discussed a coverage "trigger" not adopted in Montrose: "`Stacking policy limits means that when more than one policy is triggered by an occurrence, each policy can be called upon to respond to the claim up to the full limits of the policy. Under the concept of stacking ... the limits of every policy triggered by an "occurrence" are added together to determine the amount of coverage available for the particular claim. Thus, for example, if an insured could establish that each of four consecutive $10 million policies were triggered by a particular claim, the insured could recover $40 million for a single occurrence, rather than the $10 million available under any single policy.' (Ostrager & Newman, Insurance Coverage Disputes (9th ed. 1998) Trigger and Scope of Coverage, § 9.04[c], p. 464.)" (FMC, supra, 61 Cal.App.4th at p. 1188, 72 Cal. Rptr.2d 467, italics added.)
Looking at "stacking" from that angle, the FMC court stated: "This kind of `stacking' of the limits of an insurer's policies for consecutive policy periods has been criticized as affording the insured substantially more coverage, for liability attributable to any particular single occurrence, than the insured bargained or paid for. (Cf., e.g., Ins. Co. North America v. Forty-Eight Insulations (6th Cir. 1980) 633 F.2d 1212, 1226, fn. 28 [a variant of `stacking' `amounts to giving [the insured] much more insurance than it paid for']; Uniroyal, Inc. v. Home Ins. Co. (E.D.N.Y.1988) 707 F.Supp. 1368, 1392 [`stacking in this manner makes the aggregate limits and the separately negotiated premiums for each policy illusory by expanding coverage to the sum of both policies'].) [¶] Insurers sometimes include *709 `anti-stacking' provisions in their policies to avoid just this kind of result. Where, as in this action, there is no anti-stacking provision, there is precedent, characteristically in asbestos cases, for judicial intervention." (FMC, supra, 61 Cal.App.4th at pp. 1188-1189, 72 Cal.Rptr.2d 467, italics added.)
These introductory comments by the FMC court form the basis of the excess insurers'"anti-stacking" argument in this case. But neither the facts nor the policy provisions at issue in FMC, nor the cases or treatise on which the FMC court relied, support the argument here.
In FMC it is clear that in the absence of an express anti-stacking provision, perceived unfairness in holding a single insurer responsible for multiple "per occurrence" limits in successive policies was a basis for "judicial intervention." Such considerations are not present here, where multiple insurers agreed to indemnify Alpha for all sums it became legally obligated to pay as damages because of bodily injury occurring during the policy period, caused by an occurrence. Each insurer agreed that its "per occurrence" limits would apply to all damages because of bodily injury during the policy period caused by a single occurrence. No insurer stated in its policy that, in the event that a single occurrence caused injuries in more than one policy year, the insurer would only be liable for a share of the highest "per occurrence" limits the insured purchased (perhaps from other insurers in a different policy year) for any single policy year.
FMC's discussion of the nature of "stacking" must also be assessed in light of the unique definition of "occurrence" in the FMC policies, which is different from that in the policies before us. There, "occurrence" was defined as "`an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in ... property damage ... during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.'" (61 Cal.App.4th at p. 1149, 72 Cal.Rptr.2d 467.) The court recognized the general rule that, "for the purpose of determining the number of occurrences under a liability insurance policy (usually as a means of calculating policy limits) `occurrence has generally been held to mean the underlying cause of the injury, rather than the injury or claim itself .... [Citation.]" (FMC, supra, 61 Cal.App.4th at p. 1161, 72 Cal.Rptr.2d 467, italics added.) But the court recognized that this "case law" rule was "modified" by the FMC policies' unique definition of "occurrence." (Id. at p. 1149, 72 Cal.Rptr.2d 467.) The FMC policies were thus susceptible to an interpretation that equated the injury with the "occurrence" that caused the injury. The FMC court therefore found that there was one "occurrence" at any particular site.
In concluding that judicial intervention was warranted to prevent the insured from recovering up to $7 million at each site, rather than the $1 million "per occurrence" limits under the policies, the FMC court relied on a number of precedents: Ins. Co. North America v. Forty-Eight Insulations, supra, 633 F.2d 1212 (Forty-Eight Insulations), Keene Corp. v. Ins. Co. of North America, supra, 667 F.2d 1034 (Keene), and Uniroyal, Inc. v. Home Ins. Co., supra, 707 F.Supp. 1368 (Uniroyal). These do not support intervention here.
Forty-Eight Insulations (an asbestos-related injury case) sought to avoid a unique "stacking" problem: "Appellants are correct that the exposure theory [a coverage trigger different than Montrose's `continuous injury' trigger] we adopt has *710 problems with `stacking.' From 1955 through 1977, Forty-Eight held twelve different insurance policies issued by five different companies. Eleven of these policies had aggregate limits of from $300,000 to $500,000 per occurrence. The twelfth policy had an aggregate limit of $1,000,000. The combined aggregate limits of the twelve policies is $5.6 million. [¶] The problem is that if the inhalation of each asbestos fiber is deemed to be a separate `bodily injury,' this results in the `stacking' of liability coverage to produce coverage that is many times [the combined aggregate limits of] $5.6 million. This amounts to giving Forty-Eight much more insurance than it paid for."
(Forty-Eight Insulations, supra, 633 F.2d at p. 1226, fn. 28.)
The court found the solution to the perceived problem to be that "no insurer should be held liable in any one case to indemnify [the insured] for judgment liability for more than the highest single yearly limit in a policy that existed during the period of the claimant's exposure for which judgment was obtained.... [¶] ... The initial exposure to asbestos fibers in any given year triggers coverage. However, under the terms of the policies, additional exposure to asbestos fibers is treated as arising out of the same occurrence. Thus, on its face, the liability of each insurer is limited to maximum amount `per occurrence' provided by each policy. We have no problem with the district court's extending the policy language so that each insurer would face no more liability per claim than the maximum limit it wrote during any applicable year of coverage." (Forty-Eight Insulations, supra, 633 F.2d at p. 1226, fn. 28.)
Forty-Eight Insulations limited each insurer's liability "per claim," despite numerous potentially injurious "exposures" that resulted in that claim. It did not purport to limit an insured to a single year's coverage for all claims on the ground that they were caused by a single "occurrence," as the trial court did in this case. We agree with Forty-Eight Insulations that an insured should not get "more insurance than it paid for." But making sure that an insured gets no more than it paid for is merely the logical result of applying the terms of the policy so that the gains and losses fall where they may, as the Supreme Court concluded in Aerojet, supra.
Keene was also an asbestos injury case upon which FMC relied. The court noted, "[Keene] dealt similarly with the stacking issue: `[The insured] claims that it is entitled to full indemnity for each injury up to the sum of the limits provided by the applicable policies. We do not agree. The principle of indemnity implicit in the policies requires that successive policies cover single asbestos-related injuries. That principle, however, does not require that [the insured] be entitled to "stack" applicable policies' limits of liability. To the extent possible, we have tried to construe the policies in such a way that the insurers' contractual obligations for asbestos-related diseases are the same as their obligations for other injuries. Keene is entitled to nothing more. Therefore, we hold that only one policy's limits can apply to each injury. Keene may select the policy under which it is to be indemnified.' [Citation.]" (FMC, supra, 61 Cal.App.4th at pp. 1189-1190, 72 Cal.Rptr.2d 467, italics added.)
Although the FMC court concluded "Keene's statement of such a rule is appropriate in the circumstances of this case for reasons well articulated in Keene and cognate cases" (61 Cal.App.4th at pp. 1190-1191, 72 Cal.Rptr.2d 467, italics added), the Keene "rule" does not support summary judgment here. Keene held that only one policy's limits can apply to each injury. In other words, for any individual *711 claimant's continuing injury, a single policy limit sets the maximum recovery. Adhering to Keene in this case would not limit Alpha to recovery of one year's total coverage for thousands of injuries taking place over different times simply because they were all caused by a single "occurrence," as the trial court here held.
In Uniroyal, the insured faced liability for bodily injuries stemming from the manufacture, delivery and spraying of "Agent Orange," and sought indemnification under two successive policies. Applying New York law and its "injury in fact" coverage trigger (distinct from Montrose's "continuous injury" trigger), the Uniroyal court found that covered injuries took place in each policy period, and that all the injuries were caused by a single "occurrence." Nevertheless, the court did not confine recovery to a single year's policy limits for all the injuries taking place during either policy period.
Instead, the Uniroyal court sought to devise an appropriate method to allocate losses from injuries from one continuous occurrence spanning two successive policy periods, with resulting injuries triggering both policies. (Uniroyal, supra, 707 F.Supp. at p. 1391.) The Uniroyal court rejected "stacking" as a method for allocating the losses, but nevertheless allowed the insured to recover under both policies:
"`Stacking' would permit the insured to add the two policies' aggregate limits and deductibles together and apply that total to the net loss suffered by the insured. Here, for each occurrence, the first policy triggered covers up to $6 million with a $100,000 deductible, and the second covers up to $10 million with a $100,000 deductible. Stacked together the policies would cover $16 million per occurrence with a $200,000 deductible per occurrence. This method improperly divorces the coverage from the injuries triggering the coverage; it simply lumps all the injuries into one large pool. In addition, it fails to distinguish what portion of the $16 million would come from each policy if each were written by a different insurer. Finally, even with the same insurer on both policies, stacking in this manner makes the aggregate limits and the separately negotiated premiums for each policy illusory by expanding coverage to the sum of both policies. In the usual case, where injuries are clearly assignable to one policy or the other, the insured might fall below its aggregate cap in one policy but exceed it in the other. In that event the insured would receive full indemnity in the first period and part in the second. By stacking, the insured could circumvent the maxima to demand full indemnity for all its losses." (Uniroyal, supra, 707 F.Supp. at pp. 1391-1392, italics added.)
Although both policies in Uniroyal were issued by a single insurer and all injuries were caused by a single continuing "occurrence," the Uniroyal court determined that the insured was entitled to indemnity under each policy, without limiting the amount of indemnity to the limits of a single policy:
"For each injury, a policy is triggered. Each time a policy is triggered, the court must look to all the injuries triggering that policy and determine the number of occurrences from which those injuries result. Here under each policy there will be one continuous occurrence. The court must then calculate the losses attributable to those injuries triggering each policy, and apply the per occurrence deductible and maximum once to each occurrence under each policy. This is exactly the method the court would apply if there were multiple occurrences. [Citation.] No hardship *712 should be imposed by this method on the insurer, since the insurer contracted for the per occurrence limits under each policy, with the understanding that a large continuous occurrence might cause many injuries under each of several policies" (Uniroyal, supra, 707 F.Supp. at p. 1393, italics added.)
Uniroyal does not support the trial court here, where under the same basic circumstances, Alpha's recovery was limited to a single policy year.
Nor does the insurance treatise on which the FMC court relied to describe the concept of "stacking" support summary judgment here. Notwithstanding the treatise's general description of "stacking" as combining the limits of successive policies triggered by an "occurrence," none of the opinions discussed expresses a rule against recovery of multiple policy limits where, a single continuing occurrence potentially causes distinct injuries or damages in different policy periods. (Ostrager & Newman, Insurance Coverage Disputes, supra, § 9.04[c], pp. 464-467.)
Finally, the actual result in FMC does not support the trial court's application of anti-stacking principles here. The FMC court announced that application of the Keene rule was appropriate under the circumstances, but did not explain the method of application: "Because in the case before us coverage is ultimately keyed to and limited by the concept of `occurrence,' and because the London defendants provided multiple layers of coverage, with varying effective dates, in each policy period, application of Keene's rule in this case is relatively complex. For clarity we shall modify the judgment herein to substitute for the trial court's references to `the antistacking qualifications of ... Armstrong and Keene' a provision that only the policy limits of London umbrella and excess policies in effect as of July 1 in one of the policy periods in which coverage is triggered for a single occurrence can apply to property damage attributable to that occurrence, but that if coverage for that occurrence is triggered in more than one policy period FMC may select the policy period in which the policy limits are to be fixed." (FMC, supra, 61 Cal.App.4th at p. 1191, 72 Cal.Rptr.2d 467, italics added.)
The FMC court did not discuss the impact of its decision on the upper level excess coverages, and left the reader uncertain as to the significance of the July 1 date which was not explained. The court had already recognized that, under Montrose, coverage was not "triggered" by an "occurrence," but instead by "property damage" during the policy period. Yet in summarizing its ruling the FMC court referred to "coverage ... triggered for a single occurrence," and "coverage for [an] occurrence." (61 Cal.App.4th at p. 1191, 72 Cal.Rptr.2d 467.) Out of context, FMC's use of the term "occurrence" as a coverage trigger and as an element of damage or injury subject to Keene's "antistacking" rule would seem to conflict with its reliance on Montrose and the above-cited authorities.
We conclude FMC's reference to selecting a single policy period to fix the limits applicable to a particular "occurrence" must be taken together with the unique definition of "occurrence" in the FMC policies and the court's earlier observations that there was at least one "occurrence" for each of the contaminated sites. For each such site "occurrence," the insured was entitled to select a policy year in which the total limits of insurance would be fixed. In this light, the outcome of the application of the "anti-stacking" rule in FMC is essentially the same as that in the authorities on which it relied, i.e., "one injuryone policy limit," not "one occurrenceone policy limit" as these excess *713 carriers argue.[12] Neither FMC nor the authorities on which it relied indicate that it is impermissible "stacking" to allow an insured to recover up to the "per occurrence" limits of a number of successive policies for multiple continuing bodily injuries commencing and continuing over different periods of time, merely because all such injuries were caused by a single continuing "occurrence."

2. Application of Policy Terms in This Case.
The expressed concern of FMC and the cases on which it relied was that an insured might recover more insurance than it bargained for or render separately negotiated policy limits or premiums illusory. We therefore examine the actual terms of the policies in light of the facts before us. Doing so will, by definition, ensure that Alpha does not get more coverage than it bargained or paid for.
In each excess policy in this case the insurer's basic agreement was to indemnify Alpha for "all sums" it became liable to pay as damages because of bodily injury taking place during the policy period, so long as Alpha's liability for damages because of bodily injury during the policy period exceeded the applicable limits of the underlying insurance. The Limits of Liability provisions on which the insurers seek to rely do not alter that basic agreement, they merely define its monetary extent. The Limits of Liability provisions set "per occurrence" and "aggregate" caps on Alpha's recovery under a particular policy for covered damages because of bodily injury during the policy period, based on the number of "occurrences" that caused those injuries.
Each insurer has an independent contractual obligation to the insured. Each policy provides that for all bodily injuries during the policy period caused by a single "occurrence," the applicable limit of the insurer's liability under that policy for damages because of bodily injury during the policy period is a single "per occurrence" limit. The policies do not provide that if a single continuing "occurrence" also causes bodily injuries in other policy periods (injuries which in this case may involve not only continuing injuries but also new infections of individual claimants during policy periods covered by different insurers) the insurer will be liable for no more than a share of the highest "per occurrence" limits an insured purchased for any given policy year.
In summary, the significance of the parties' stipulation that all AIDS-related bodily injuries were caused by a single "occurrence" is that, assuming proof of damages of such injuries during a given policy period, recovery under each policy is limited to a single "per occurrence" limit.[13]
"Stacking," in the sense criticized by the above authorities as an impermissible attempt to recover more than the insured bargained for, or to recover under more than one policy for a single injury where the limits of a single policy would be insufficient, was not established by the excess carriers in moving for summary judgment. Although the parties agreed Alpha faced liability for multiple continuous and progressive "bodily injuries," and that a single "occurrence" caused bodily injuries in all seven policy years, there is no indication *714 that all the injuries taking place in any given policy year were identical or that they were continuations of injuries taking place in any other policy year. The record is also devoid of any indication that Alpha seeks to "stack" the limits of successive policies to make multiple "per occurrence" policy limits applicable to any particular bodily injury claim.
The excess carriers appear to argue that the combination of the Montrose "continuous injury" trigger and the policies' express promise to pay "all sums" the insured becomes liable to pay because of covered injury or damage force the conclusion that in any case of injuries or damage covered under successive policies, there is by definition some type of impermissible "stacking." This premise is mistaken.
It is true that case law has determined that once a policy is triggered by an injury during the policy period, that insurer remains responsible for continued harm thereafter. (See, e.g., Armstrong World Industries, supra, 45 Cal.App.4th at p. 57, 52 Cal.Rptr.2d 690.) This is a function of the insurers' agreement to pay, "all sums" an insured becomes liable to pay "because of bodily injury during the policy period, and not just the monetary equivalent of the portion of a continuing "bodily injury" that takes place during that period. The "continuous injury" trigger identifies the policies that may be responsible to indemnify the insured for a given continuous and progressive loss; it is a measure of the total potential coverage available to the insured from all of its insurers. Once coverage is established, the "all sums" concept confirms the scope of each insurer's actual indemnity obligation. Both concepts are firmly based in the language of the policies. The fact that multiple insurers may have independent contractual obligations to indemnify an insured that are triggered by successive temporal portions of a continuing loss, but measured by the full amount of that loss, does not necessarily establish unintended "stacking." The insured can only be indemnified once for the sums it paid because of any particular covered injury.
The parties agree that the indemnity obligation for covered damages attributable to a continuing injury should be allocated between the successive carriers that cover those damages. Allocation of a loss among carriers does not require more than one carrier to pay the insured "all sums" the insured has become liable to pay because of a particular covered loss. Nor can it be said that in paying an allocated share of a loss covered by multiple successive insurers, any insurer is providing the insured a windfall by duplicating coverage provided by another carrier.
The excess insurers' argument that Alpha must be confined to a single year's coverage for all bodily injuries caused by a single "occurrence," regardless of when those injuries were suffered, has no basis in the policy language and is not supported by the cases on which the insurers rely. We discern no policy or evidentiary basis for peremptorily limiting Alpha's potential recovery to the limits of a single year's coverage on summary judgment. The judgments in favor of the insurers will be reversed, and the matter remanded to the trial court for further proceedings consistent with this opinion.

D. Allocation Issues.
On remand, the trial court will be called upon to apply principles of equity and fairness in determining how best to allocate the responsibility for indemnifying Alpha for any covered losses Alpha is able to prove. For the guidance of the parties and trial court on remand, and assuming (without deciding) actual coverage, we make the following observations.
*715 There is no specific allocation rule that must be employed in every case. The trial court has discretion to fashion an equitable allocation under the circumstances. (Stonewall, supra, 46 Cal. App.4th at p. 1853, fn. 14, 54 Cal.Rptr.2d 176.) The facts of the case necessarily inform the exercise of the trial court's discretion. "Qualified time on the risk" and other allocation methods have been accepted by various appellate courts as proper exercises of trial court discretion under the particular facts of a given case. But none of these methods must be employed if the facts would render it inequitable to do so.
The factual matrix here appears somewhat different than in a case involving continuous and progressive property damage. For example, a large single event such as a spill of contaminants or a gradual exposure to harmful conditions may cause covered continuous and progressive injury over an extended period of time. Under those circumstances, there may be no reason to treat one of several successive policy periods differently than any other.
Here, Alpha (and AIIC) argue that there is a factual basis for treating later policy periods differently, insisting they can demonstrate that more AIDS-related injuries took place in later policy periods. The court's rulings on the summary judgment motions do not contain factual findings to which we must defer. The evidence before the trial court concerning the timing of injuries was in conflict in various respects and was not examined free of the notion that Alpha had already received more than it was entitled to under the "anti-stacking rule." We note only that it does not offend common sense to hypothesize that, if a disease process is not instantly fatal, there may be more persons suffering bodily injuries in later policy periods than earlier. If Alpha is able to make that factual showing to the trial court, those facts should be taken into consideration in determining how best to allocate responsibility for covered damages consistent with any other pertinent facts and the terms of the various policies.
The issue of "horizontal exhaustion" will undoubtedly arise. The premise of horizontal exhaustion is that all primary policies that cover damages because of a continuous and progressive loss or injury should pay before any excess carrier covering the same continuing loss or injury. (See generally Community Redevelopment Agency v. Aetna Casualty & Surety Co., supra, 50 Cal.App.4th at pp. 339-340, 57 Cal.Rptr.2d 755.) But this case does not appear to involve a single continuous injury nor a group of necessarily coterminous injuries. It may not be accurate to assume that all "low-level" excess policies cover the same damages as the higher level excess policies, thereby undercutting the rationale for requiring "complete" horizontal exhaustion. If the trial court ascertains that the facts warrant differentiation among the various policy years, the facts may indicate that certain high-level excess policies should be called upon to indemnify the insured, although lower-level excess policies in other years should not.

E. Additional Arguments by Excess Insurers[**]

DISPOSITION
The judgments in favor of The Home Insurance Company, Transcontinental Insurance Company, London Guarantee and Accident Company of New York, Harbor Insurance Company, Transport Indemnity Insurance Company, Associated International Insurance Company, and Topa Insurance *716 Company are reversed, and the matter remanded to the trial court for further proceedings consistent with this opinion. Appellant to recover costs on appeal.
BOREN, P.J., and COOPER, J., concur.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of Discussion, part E.
[1] A heat treatment which inactivates the HIV virus was approved by the FDA in 1984.
[2] Alpha presented evidence of a study conducted by Dr. Barbara Kroner and others referred to by the parties as the "Kroner Study" which found that the earliest documented seroconversions of HIV infected individuals took place in Spring 1978 with the period of risk of infection continuing until Spring 1987. According to Alpha, the study shows that over 50 percent of the approximately 10,000 hemophiliacs that became infected with HIV had seroconverted before the first reported case of AIDS in the hemophiliac community in 1982, over 70 percent by the end of 1982, and approximately 90 percent by the end of 1983.
[3] Prior to the summary judgments from which Alpha appeals, Alpha dismissed its primary insurer and some excess liability insurers after they paid or agreed to pay their policy limits, or settled with Alpha for less than policy limits.
[4] Alpha was one of four defendants in a class action suit (the Walker case) brought on claims of HIV infection from the use of blood factors. In the settlement approved by the United States District Court in the Northern District of Illinois in May 1997, each of the "fractionators" contributes to the Walker settlement fund based on its market share of the non heat treated product sold between 1978 and 1985. Proof of an individual claimant's date of infection is not a condition of payment; the claimant need only show that the person on whom the claim is based had hemophilia, used factor concentrates processed or distributed by one of the fractionators between 1978 and 1985, and was infected with HIV. At the time of the summary judgments numerous claims within the class settlement remained to be approved or paid.
[5] The CNA Companies, three of which are respondents here, contend they paid a sum "in full and complete settlement of all claims of individuals `who have not opted-out or been deemed to have opted-out' [from the Walker class settlement]." CNA contends its contribution with respect to the Walker claims resolves the issue of its responsibility for more than the $100 million of Alpha's liability that it can recover from the insurers under the "anti-stacking" rule. Whatever the impact of CNA's limited settlement, as discussed below CNA has not demonstrated that the anti-stacking rule limits Alpha's recovery to $100 million. CNA has not otherwise attempted to establish that it cannot be responsible to indemnify Alpha for additional AIDS-related claims.
[6] No evidence established that Alpha's eventual total liability for AIDS-related claims could not exceed the sums it had received or was deemed to have received from its insurers and thereby pierce the excess layer.
[7] The policies provided "per occurrence" limits (generally the limit of the insurer's liability as a result of covered injuries or damage arising from a single "occurrence"), and "aggregate" limits (the limit of the insurer's total liability for covered injuries or damage arising from multiple "occurrences"). Because the parties have stipulated that all of the AIDS-related claims arose from a single "occurrence," and the record gives no indication that any of Alpha's insurers have paid any other sums for any unrelated "occurrences," the only pertinent limits are the "per occurrence" limits.
[8] AIIC, as a "low level" excess insurer allegedly "aggrieved" by the portion of the court's decision adopting the "qualified time on the risk" allocation, has also appealed the judgments in favor of CNA, Transport and Home.
[9] No excess insurer argues that it was entitled to summary judgment because it does not "follow form" to the underlying coverage.
[10] As discussed below, by virtue of the insurer's agreement to pay "all sums" the insured becomes liable to pay as damages "because of" bodily injury during the policy period, the insurer's indemnification obligation may not be strictly limited to the value of the portion of a continuing injury that takes place during the policy period. (See Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co. (1996) 45 Cal.App.4th 1, 57, 52 Cal.Rptr.2d 690 Armstrong World Industries).)
[11] Subject, of course, to the policy's "aggregate" limit, i.e., the most the company will pay regardless of the number of "occurrences."
[12] We do not express an opinion as to the correctness of FMC's "anti-stacking" ruling based on the facts of that case. For purposes of review of these summary judgments it is sufficient to determine that any "anti-stacking rule" that can be derived from FMC is not controlling here.
[13] Subject to any "per occurrence" deductible.
[**] See footnote *, ante.